THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v.* SAGE, APPELLEE AND CROSS-APPELLANT.

[Cite as State *v.* Sage (1987), 31 Ohio St. 3d 173.]

174

(No. 86-1047—Decided July 8, 1987.)

---
[1] See Appendix A, *infra,* at 189.

*Michael Miller,* prosecuting attorney, *Karen L. Martin* and *Alan Travis,* for appellant and cross-appellee.

*James Kura,* county public defender, and *Barbara J. Slutsky,* for appellee and cross-appellant.

ALICE ROBIE RESNICK, J. Several issues are presented for review by the appeal and cross-appeal, each of which will be addressed in turn. For the reasons set forth below, we reverse in part and affirm in part the judgment of the court of appeals and reinstate the judgment of the trial court.

I

The first issue presented by the state's appeal is whether an instruction on a lesser included offense should have been given by the trial court. Under Ohio law, a defendant may be convicted of a lesser included offense "* * * if lesser offenses are included within the offense charged * * *." Crim. R. 31(C). See, also, R.C. 2945.74. However, this does not imply that a court is required to instruct on lesser offenses simply because they are included in the charged offense. *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382, 387, 18 O.O. 3d 528, 531, 415 N.E. 2d 303, 307.

Over the years, this court has refined the rule governing when a trial

court is required to instruct on lesser included offenses. In *State* v. *Loudermill* (1965), 2 Ohio St. 2d 79, 31 O.O. 2d 60, 206 N.E. 2d 198, syllabus, it was held that "[w]here the evidence in a criminal case would support a finding by the jury of guilt of a lesser offense included in the offense for which defendant was indicted and tried, the refusal of the trial court to charge upon that lesser included offense is error prejudicial to the rights of defendant." (Citations omitted.) This rule was further examined in *State* v. *Nolton* (1969), 19 Ohio St. 2d 133, 48 O.O. 2d 119, 249 N.E. 2d 797. In that case, the court observed that "* * * it is obvious that proof which will support a conviction for the principal offense will invariably support a conviction on the lesser." *Id.* at 134, 48 O.O. 2d at 120, 249 N.E. 2d at 798. Hence, a more utilitarian rule was advanced. Accordingly, the *Nolton* court reasoned that "[i]f the evidence adduced on behalf of the defense is such that if accepted by the trier it would constitute a complete defense to *all* substantive elements of the crime charged, the trier will not be permitted to consider a lesser included offense for the reason that an unreasonable compromise would be invited on the state's evidence:

"On the contrary, if the trier could *reasonably* find against the state and for the accused upon one or more of the elements of the crime charged and for the state and against the accused on the remaining elements, which by themselves would sustain a conviction upon a lesser included offense, then a charge on the lesser included offense is both warranted and required, not only for the benefit of the state but for the benefit of the accused." (Emphasis *sic.*) *Id.* at 135, 48 O.O. 2d at 120, 249 N.E. 2d at 798.

In *Wilkins, supra,* the court clarified its pronouncement in *Nolton, supra,* stating:

"If the evidence adduced on behalf of the defense is such that if accepted by the trier of fact it would constitute a complete defense to all substantive elements of the crime charged, the trier of fact will not be permitted to consider a lesser included offense unless the trier of fact could reasonably find against the state and for the accused upon one or more of the elements of the crime charged, and for the state and against the accused on the remaining elements, which, by themselves, would sustain a conviction upon a lesser included offense.

"The persuasiveness of the evidence regarding the lesser included offense is irrelevant. If under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense, the instruction on the lesser included offense must be given. The evidence must be considered in the light most favorable to defendant." *Id.* at 388, 18 O.O. 3d at 532, 415 N.E. 2d 308.

Resolution of the present issue involves an analysis of whether any offense is committed under Ohio law as a result of a death occurring during the execution of a mutual suicide pact. Appellee moved for an instruction on the lesser included offense of involuntary manslaughter based upon either assault or aggravated menacing. The trial court overruled the mo-

tion and only instructed on aggravated murder with prior calculation and design.

It is not a crime under Ohio law to attempt or commit suicide. Appellee contends that a mutual suicide pact existed between himself and decedent. Further, it is the defense's contention that by providing decedent with the means to commit suicide he could possibly be guilty of assault (or aggravated menacing). Thus, the charge on involuntary manslaughter based on a misdemeanor would be an appropriate instruction. The question, therefore, arises as to whether a surviving participant of a mutual suicide pact, who provides the means of death to the decedent, is guilty of a criminal offense under existing Ohio law. We conclude that he is not.

At common law, suicide was a felony punishable by forfeiture of property and an ignominious burial. Also at common law, one who aided, advised or abetted a suicide was guilty of murder. *In re Joseph G.* (1983), 34 Cal. 3d 429, 434, 194 Cal. Rptr. 163, 166, 667 P. 2d 1176, 1179. Although suicide was considered a criminal act at common law, most jurisdictions do not affix a criminal penalty to suicide today.[2] Some jurisdictions, however, have enacted legislation making aiding and abetting suicide a separate crime.[3] Thus, depending upon a particular state's statutory procedure,

---

[2] A majority of jurisdictions has adopted statutes making it a crime to aid, abet or advise a suicide. Comment, The Punishment of Suicide — A Need for Change (1969), 14 Vill. L. Rev. 463, 473. Many of the jurisdictions which attach criminal responsibility have followed the Model Penal Code, which provides:

"(1) *Causing Suicide as Criminal Homicide.* A person may be convicted of criminal homicide for causing another to commit suicide only if he purposely causes such suicide by force, duress or deception.

"(2) *Aiding or Soliciting Suicide as an Independent Offense.* A person who purposely aids or solicits another to commit suicide is guilty of a felony of the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a misdemeanor." Model Penal Code (1962), Section 210.5.

Under the Model Penal Code, a survivor of a suicide pact may, therefore, be guilty of homicide or of the separate offense of aiding or soliciting suicide, contingent upon his role in causing the other's death.

[3] "States that have criminalized assisting suicide as a specific offense include Cal. Penal Code § 401 (West 1970); Conn. Gen. Stat. § 53a-56 (West 1981); Del. Code Ann. tit. 11, § 645 (1979); Fla. Stat. Ann. § 782.08 (West 1976); Kan. Stat. Ann. § 21-3406 (1981); Me. Rev. Stat. Ann. tit. 17-A, § 204 (1982); Minn. Stat. Ann. § 609.215 (West 1964); Miss. Code Ann. § 97-3-49 (1972); Mo. Ann. Stat. § 565.021 (Vernon 1979); Mont. Code Ann. § 45-5-105 (1981); Neb. Rev. Stat. § 28-307 (1979); N.J. Stat. Ann. § 2C:11-6 (West 1981); N.M. Stat. Ann. § 30-2-4 (1978); N.Y. Penal Law § 120.30 (McKinney 1975); Okla. Stat. Ann. tit. 21, §§ 813-818 (West 1958 & Supp. 1981-1982); 18 Pa. Cons. Stat. Ann. § 2505 (Purdon 1973); P.R. Laws Ann. tit. 33, § 1385 (1969); S.D. Codified Laws Ann. § 22-16-37 (1979); Tex. Penal Code Ann. § 22.08 (Vernon 1974); Wash. Rev. Code Ann. § 9A.36.060 (1977); Wis. Stat. Ann. § 940.12 (West 1982)."

Engelhardt & Malloy, Suicide and Assisting Suicide; A Critique of Legal Sanctions (1983), 36 Sw. L. J. 1003, 1019, fn. 72. Other states include Ind. Stat. Ann. Section 35-42-1-2 (Burns 1985) and N.H. Rev. Stat. Ann. Section 630:4 (1986).

such act is prosecuted as either murder or an independent offense of aiding and abetting a suicide. The Ohio Legislature has not enacted a statute which makes aiding and abetting suicide a crime in Ohio.

In discussing mutual suicide pacts, the California Supreme Court has stated in *In re Joseph G., supra,* 34 Cal. 3d at 437, 194 Cal Rptr. at 168, 667 P. 2d at 1181:

"The mutual suicide pact situation, however, represents something of a hybrid between the attempted suicide and the aiding suicide scenarios. In essence, it is actually a double attempted suicide, and therefore the rationale for not punishing those who attempt suicide would seem to apply. 'Although there may have been aiding and abetting involved in the suicide pact, the survivor is distinguishable from a nonsuicide pact aider and abettor in the sense that he was also a potential victim.' (*Id.* [14 Vill. L. Rev.] at p. 480.) 'Suicides in pursuance of a pact are merely cases of double or multiple suicides. There can be no more justification for punishing an attempted double suicide than for punishing an attempted individual suicide. As in the case of an attempt at individual suicide, punishing the survivor of a genuine pact can serve no deterrent purpose, may hinder medical treatment, and is merely useless cruelty. * * *' "(Footnote omitted.)

Suicide is not a crime in California, but assisting a suicide is. California has created a *sui generis* crime of aiding and abetting suicide. The Supreme Court of California in *In re Joseph G., supra,* 34 Cal. 3d at 438, 194 Cal Rptr. at 168, 667 P. 2d at 1181, queried: "* * * should one who attempts suicide by means of a mutual suicide pact be liable for first degree murder at one extreme, or at the other, only for aiding and abetting a suicide? The current law in California provides no options save these." (Footnote omitted.)

Appellee asserted that he had entered into a mutual suicide pact with decedent. In following the foregoing California rationale, the appellee was a potential victim of the mutual suicide pact. While he may have in some way aided in and abetted the suicide of decedent by providing the gun, there is no justification for placing criminal responsibility on the appellee under such circumstances since under Ohio law, suicide, attempted suicide or aiding and abetting a suicide are not crimes. Therefore, if the trier of fact believed defendant's version of the facts, then no criminal responsibility could be placed upon appellee. The assertion that a death was the result of a mutual suicide pact is a complete defense to any crime by the survivor to the pact. Pursuant to *Wilkins, supra,* at 388, 18 O.O. 3d at 532, 415 N.E. 2d at 308, "[i]f the evidence adduced on behalf of the defense is such that if accepted by the trier of fact it would constitute a complete defense to all substantive elements of the crime charged, the trier of fact will not be permitted to consider a lesser included offense * * * "

In conclusion, the evidence presented in this case, if believed by the trier of fact, would either show that the defendant by prior calculation and

design killed decedent or that she killed herself as part of the mutual suicide pact. The prior calculation and design can be found in the manner of the shooting and in the suicide note. Therefore, we find that there was no set of facts presented whereby "* * * the trier of fact * * * [could have found] for the defendant and against the state on some element of the greater offense which was not required to prove the commission of the lesser offense and for the state on the elements required to prove the commission of the lesser offense." *State* v. *Solomon* (1981), 66 Ohio St. 2d 214, 20 O.O. 3d 213, 421 N.E. 2d 139, at paragraph two of the syllabus. We, therefore, conclude that under existing Ohio law, the trial court was correct in refusing to instruct on the lesser included offense of involuntary manslaughter.

## II

Appellant asserts that the court of appeals erred in holding that prejudicial error was committed when testimony by decedent's mother was admitted into evidence regarding the contents of the writing found on the reverse side of the suicide note.[4]

The record demonstrates that the state introduced this testimony in order to establish that the decedent did not draft the suicide note by her own volition, but, instead, that appellee forced her to write the note while he dictated its contents. Continuing, the state maintained that after having dictated the contents of the note, appellee, with prior calculation and design, murdered the decedent, and then to give credence to the theory of a mutual suicide pact, inflicted gunshot wounds to himself.

The letter in question was written on the reverse side of the suicide note. It can certainly be presumed, therefore, that decedent knew her parents would be reading both sides of the last writing left by her prior to her death. It was thus relevant to the issue involved as to whether decedent ever expressed herself in this way to her mother.[5] The letter to ap-

---

[4] See Appendix B, *infra,* at 190.

[5] Mrs. Wanner testified as follows:
"Q.  Do you recognize the writing on that document?
"A.  Yes, this looks like Cathy's.
"Q.  It looks like Cathy's writing?
"A.  Yes, it does.
"Q.  I want to ask you some questions about it. Can you see that screen from there?
"A.  Yes.
"Mr. Kravitz: For the record, note a continuing objection to this testimony that's going to follow, and I won't interrupt you as you go.
"The Court: The objection is overruled.
"Q.  (By Mr. Johnson): Now, the document that I just showed you, this is a replica, does this appear to be Cathy's writing?
"A.  Yes, it does.
"Q.  This is from the other side. Does that also appear to be Cathy's writing?
"A.  Yes.

pellee was sexually explicit; hence, if the decedent never talked in this way to her mother, then she probably would not have voluntarily and freely written a suicide note on the reverse side of the letter.

The admission of Mrs. Wanner's testimony rested upon a question of relevancy. Evid. R. 401 provides:

" 'Relevant evidence' means evidence having any tendency *to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.*" (Emphasis added.)

The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. The testimony of Mrs. Wanner tended to make it less probable that her daughter freely wrote the suicide note in view of the contents of the letter on the reverse side. Thus, the testimony is relevant.

Assuming, *arguendo,* that the court of appeals was correct in its determination that this testimony was inadmissible, we nevertheless conclude that the remaining evidence presented at trial provided overwhelming evidence that decedent had not voluntarily written the suicide note. One expert witness, a document examiner, testified that the note contained crossed-out words which stated, "But th— guy wants [to] kill me."[6] In ad-

---

"Q. Now, I ask you before whether Cathy discussed boys with you?
"A. Oh, yes, she discussed boys.
"Q. Boys in the sense of boyfriends, that kind of thing?
"A. Yes.
"Q. In those discussions, did she ever talk about any of those boys that I want his whole self? Did she ever say anything like that?
"A. Hardly, no.
"Mr. Kravitz: I object.
"The Court: Excuse me, are those words in the letter here?
"Mr. Kravitz: Yes.
"The Court: Overruled.
"Q. (By Mr. Johnson): Did she ever say to you anything like when he touches me, I feel warm all over and inside; did she ever say that about any boy?
"A. No, sir.
"Q. Did she ever say, I want to give whole self to a boy?
"A. No.
"Q. Anything like that?
"A. No."

[6] Walter S. Knight, a document examiner for the Ohio State Bureau of Criminal Identification and Investigation since 1954, and a senior examiner since 1965, testified, in part, as to the crossed-out portion of Ms. Wanner's purported suicide note:

"[Mr. Knight]: * * * The difficulty in this particular matter was that, apparently, the writer crossed this out while in the process of writing the letter. In other words, it was done probably with the same pen. I could find no evidence that it was not the same pen. So after that we did everything we could with photography, and we found that with this very bright lighting at a low angle coming from the right side of this thing, that we could make out the majority of what was there, and I don't think I can show you from your transparency because

dition, another expert testified that there was a phrase at the bottom which stated, "I wanted to die with you Roy," the "you" having been crossed out. From this one would infer that the suicide note was dictated by the defendant and it was not voluntarily written and/or that it was written as a result of coercion or duress.

This court stated in *State* v. *Williams* (1983), 6 Ohio St. 3d 281, 290, 6 OBR 345, 353, 452 N.E. 2d 1323, 1333, certiorari denied (1983), 464 U.S. 1020:

"Although we find the police officers' conduct and, consequently, the admission of the confession improper, we do not, however, conclude that such error is prejudicial. Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt. *Harrington* v. *California* (1969), 395 U.S. 250, 254."

Clearly, the *Harrington* test has been met in this case. There was sufficient evidence without Mrs. Wanner's testimony whereby the trier of fact could find that the suicide note and letter were not the product of the decedent's voluntary acts. It cannot be said that without this evidence the

---

it's just totally blacked out. But if you will take these photographs and look at them, you will see the first word up there is 'but.' I don't think that anybody can argue with that. The portion we are talking about is a very covering under the words —

"* * *

"Q. Now, what does the rest of it say?

"A. Okay. The first word is *'but.'* Then we have got a blank in here, possibly two blanks. *'Wants.'* Very clearly you can see the (spelling) w-a-n-t-s. Two words, *'kill me'* [Emphasis added.] Through our examination, what we have come up with in this heavy blacked out area, and I'm sorry you can't see it very clearly from here, there's a 't' that lays right here. There is also a 'h' right in this area. The next two letters I lose. I just don't — I can't stand here and tell you for certain what they are. I get a hint that it very probably is 'is,' but the only thing I can get out of that first word for sure is the 'th' combination. That starts about in here. The second word in this obliteration is 'guy,' and if you will look very closely, you will see the 'y' formation here. That particular little appendage there is a bottom of a 'g.' Now, the photograph makes it a lot more visible than this as to what you're talking about. Here is the 'th guy.'

"Q. I'm going to hand you state's exhibit 3-F-U, which you already looked at, I think you just brought in. Would you show the jury that, please, maybe that will clarify it?

"A. I hope you can see this, as I think I can. Right in the beginning here is the 't.' There's the 'h' and then I lose this portion right here. But if you look right at the end of my pen, there's the 'g' and here's the 'u' and here is the 'y.' Since this is a small photograph, right in here is your 't,' and the 'h' this is where I can't be certain what the two letters are. And if you will look right here, there's the 'g,' the lower extension. Here is your 'u' and the 'y.' In the photograph here, the 't' is right in this area, and the 'h,' and this is the blank area that I can't tell what's there. But here is the 'guy,' 'g' formation here, and it's your 'u' formation, and here's the 'y.'

"Mr. Johnson: Thank you very much, Mr. Knight. I have no further questions.

"Mr. Kravitz: No questions."

verdict of the jury would have been different. Resultantly, the court of appeals erred in holding that this testimony was prejudicial to appellee.

### III

We turn now to the issues presented by appellee in his cross-appeal. Appellee argues in his first proposition of law that a mistrial should have been granted when the prosecution inquired of appellee's son as to how many other high school girlfriends his father had dated.

The granting or denying of a mistrial under Crim. R. 33 rests within the sound discretion of the trial court. See *State* v. *Williams* (1975), 43 Ohio St. 2d 88, 72 O.O. 2d 49, 330 N.E. 2d 891. Further, the trial court enjoys broad discretion in admitting or excluding evidence. An appellate court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice. *State* v. *Long* (1978), 53 Ohio St. 2d 91, 98, 7 O.O. 3d 178, 182, 372 N.E. 2d 804, 808; *State* v. *Hymore* (1967), 9 Ohio St. 2d 122, 128, 38 O.O. 2d 298, 302, 224 N.E. 2d 126, 130, certiorari denied (1968), 390 U.S. 1024.

After the objection was sustained by the trial court, the prosecution proceeded to a new line of questioning. Considering this question in light of the entire record, we cannot say that the trial court abused its discretion in denying the motion for a mistrial. This question was an isolated incident and does not amount to prosecutorial misconduct that would warrant the granting of a motion for a mistrial.

After a consideration of the entire record, we find that appellee was not denied a fair trial and that any error which might have resulted from the asking of this question was harmless beyond a reasonable doubt. See *Williams, supra* (6 Ohio St. 3d). Accordingly, we find no merit in this proposition of law.

### IV

Appellee also argues that the trial court erred in admitting testimony that was beyond the scope of the state of mind exception set forth in Evid. R. 803(3). Evid. R. 803(3) provides:

"Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will."

It was the state's contention that the decedent decided to terminate her relationship with appellee and therefore committing suicide would be inconsistent with this intention. In addition, the decedent had expressed plans for the future to college friends, which would be inconsistent with an individual who was contemplating suicide. Therefore, her state of mind immediately preceding February 22, 1982 became material to the issues involved in this case.

Three witnesses testified concerning decedent's actions and

statements during the week prior to her death. The leading case on this subject is *Mutual Life Ins. Co.* v. *Hillmon* (1892), 145 U.S. 285.[7] The statement that decedent intended to break up with appellee would appear to be inconsistent with entering into a mutual suicide pact and therefore would be admissible as evidence of her later conduct.

The statement that decedent was not going to see the appellee again and testimony that on the morning of February 21, 1982, when appellee came to her dormitory room she acted nervous and fidgety fall within the exception to the hearsay rule under Evid. R. 803(3) and are properly admissible. See, generally, McCormick, Evidence (3 Ed. Cleary Ed. 1984) 842-851, Sections 294-295.

## V

Appellee next maintains that his conviction was against the manifest weight of the evidence. Pursuant to R.C. 2953.02, this court is not required to weigh the evidence in a criminal case. See, also, *State* v. *Lane* (1976), 49 Ohio St. 2d 77, 85, 3 O.O. 3d 45, 49, 358 N.E. 2d 1081, 1088; *State, ex rel. Pomeroy,* v. *Webber* (1965), 2 Ohio St. 2d 84, 86, 31 O.O. 2d 62, 63, 206 N.E. 2d 204, 205. "This court may, however, examine the record with a view of determining whether the proper rules as to the weight of the evidence and degree of proof have been applied." *State* v. *Martin* (1955), 164 Ohio St. 54, 57, 57 O.O. 84, 87, 128 N.E. 2d 7, 12. Hence, it is not the function of this court to weigh the evidence developed at trial. However, we will examine the record in order to determine whether the evidence is of sufficient probative force to support a finding of guilt beyond a reasonable doubt. See *State* v. *Wolery* (1976), 46 Ohio St. 2d 316, 330, 75 O.O. 2d 366, 374, 348 N.E. 2d 351, 361, certiorari denied (1976), 429 U.S. 932; *State* v. *Neff* (1975), 41 Ohio St. 2d 17, 18, 70 O.O. 2d 82, 83, 322 N.E. 2d 274, 275; *State* v. *Petro* (1947), 148 Ohio St. 473, 36 O.O. 152, 76 N.E. 2d 355.

---

[7] "* * * The principal issue was whether Hillmon had in fact died; a body had been found at Crooked Creek, Kansas, and the parties disputed whether the body was that of Hillmon. Plaintiff's theory was that Hillmon had left Wichita, Kansas, about March 5, 1879, with one Brown and that on the night of March 18, 1879, while Hillmon and Brown were camped at Crooked Creek, Hillmon was killed by the accidental discharge of a gun. The defendants, on the other hand, maintained that one Walters had accompanied Hillmon and that the body found at Crooked Creek was Walters'. Defendants offered testimony that Walters had, on or about March 5, 1879, written to his sister that 'I expect to leave Wichita on or about March 5, with a certain Mr. Hillmon.' An objection to this and similar evidence was sustained. The United States Supreme Court reversed on the ground that the evidence of the letters should have been admitted:

" 'The letters * * * were competent not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon than if there had been no proof of such intention.' " (Footnote omitted.) McCormick, Evidence (3 Ed. Cleary Ed. 1984) 847, Section 295.

This court stated in *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 172, 10 O.O. 3d 340, 341-342, 383 N.E. 2d 132, 134:

"* * * This court's examination of the record at trial is limited to a determination of whether there was evidence presented, 'which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' *Atkins* v. *State* (1926), 115 Ohio St. 542, 546; *State* v. *Sorgee* (1978), 54 Ohio St. 2d 464, 465. Our review is thus confined to a determination of whether there was substantial evidence. *State* v. *Walker, supra* [(1978), 55 Ohio St. 2d 208], at page 210; *State* v. *Stewart* (1964), 176 Ohio St. 156, 160; *State* v. *Sheppard* (1956), 165 Ohio St. 293, paragraph five of the syllabus."

From a review of the entire record, it is apparent that the jury did not accept appellee's theory of a mutual suicide pact. There is sufficient evidence going to each essential element of the crime of aggravated murder. Also, there was evidence beyond a reasonable doubt which if believed by the trier of fact would indicate that appellee forced the decedent to write the suicide note, thus indicating evidence of prior calculation and design. In addition, there was evidence by Dr. Patrick Fardal, a pathologist, which would indicate that it would be very difficult to self-inflict the decedent's gunshot wounds.[8]

From the foregoing, it can be said that a jury could reasonably conclude beyond a reasonable doubt that appellee planned to kill decedent prior to inflicting the two gunshot wounds. The verdict of the jury is supported by sufficient evidence establishing guilt beyond a reasonable doubt.

## VI

Appellee, in asserting that the trial court erred in denying his motion to suppress evidence, relies, *inter alia,* on *Thompson* v. *Louisiana* (1984), 469 U.S. 17. In the instant case, a Columbus police officer, upon entering appellee's apartment, observed in plain view a note on the stairs which read "Call The Law." After going upstairs into the bedroom, he observed a male and female lying on the bed with gunshot wounds. Further, he observed a note on the dresser. After viewing the foregoing, the officer permitted the paramedics to come into the room to attend to the victims. The officer advised the paramedics not to disturb the scene.

Approximately twenty minutes after being called, the Crime Scene

---

[8] "Q.   Incidentally, Doctor, just how common is a multiple gunshot suicide?

"A.   It is rare.

"* * *

"Q.   Now, would you demonstrate for us how you might shoot yourself in the left temple with your right hand and the muzzle six inches away?

"A.   This I have more trouble with, only because I am not as freely mobile as most ladies are, so I can't attest to the mobility of Cathy Wanner, but I can attest to my immobility. But anyway, I have a difficult time placing this gun at six inches away and pulling the trigger with my trigger finger. It's about the limit of my ability to put the gun like this (indicating). * * * So I have got to kind of do this somehow so I can aim the muzzle up so that the pathway through the head (indicating) that the bullet ends up over here. So it's difficult for me to do."

Search Unit arrived and took photographs of the scene. Testimony was elicited that the photographs accurately depicted the scene as it existed on February 22, 1982. Four spent shell casings were confiscated from the bedroom. One was under the bed, another was discovered on the bed when the decedent's body was removed, a third was on top of a pillow, and a fourth was discovered on the floor between the television and the night stand. Two spent bullets were recovered later, one in a wall and the other in the mattress. The suicide note and gun were also confiscated.

The trial court denied the motion to suppress except for the spent bullets found in the wall and mattress. The court of appeals affirmed, distinguishing the instant case from *Mincey* v. *Arizona* (1978), 437 U.S. 385, and *Thompson, supra,* holding that all items except the spent bullets in the wall and mattress were in plain view and that it made no difference that the evidence was collected hours later by different officers than those who first observed the items. The plain view doctrine still applied.

Appellee argues that *Thompson, supra,* prohibited the officers from seizing these items without a warrant. This court in *State* v. *Williams* (1978), 55 Ohio St. 2d 82, 85, 9 O.O. 3d 81, 83, 377 N.E. 2d 1013, 1016, in interpreting *Coolidge* v. *New Hampshire* (1971), 403 U.S. 443, stated:

"Hence, in order to qualify under the plain view exception, it must be shown that (1) the initial intrusion which afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent."

All the items in the case at bar fall within the foregoing plain view doctrine except for the two spent bullets retrieved from inside the mattress and the wall. This case is distinguishable from *Mincey, supra,* which involved an exhaustive four-day warrantless search of an apartment, which included the opening of dresser drawers, ripping up of carpets and the seizing of two hundred to three hundred items. Also, it is distinguishable from *Thompson, supra,* in that the detectives in that case conducted a two-hour search encompassing each room in the house. The United States Supreme Court in *Thompson, supra,* at 22, stated:

"* * * To be sure, this action would have justified the authorities in seizing evidence under the plain view doctrine while they were in petitioner's house to offer her assistance. In addition, the same doctrine may justify seizure of evidence obtained in the limited 'victim-or-suspect' search discussed in *Mincey.* However, the evidence at issue here was not discovered in plain view while the police were assisting petitioner to the hospital, nor was it discovered during the 'victim-or-suspect' search that had been completed by the time the homicide investigators arrived.* * *"

It has been "* * * held that police may reenter a residence without a warrant even though the emergency situation which justified the initial entry has terminated." *United States* v. *Hoffman* (C.A. 9, 1979), 607 F. 2d 280, 284. Further, the *Hoffman* court, in discussing *United States* v. *Brand* (C.A. 5, 1977), 556 F. 2d 1312, certiorari denied (1978), 434 U.S. 1063, stated at 284:

"There, however, the court held that the police who make the second entry must restrict their later intrusion to the scope of the initial invasion * * *. [*Brand, supra,*] at 1317, n. 9. This, of course, was also the holding in *Michigan* v. *Tyler* [1978], * * * 436 U.S. [499,] at 511 * * *. See also *Mincey* v. *Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L. Ed. 2d 290 (1978); *Cupp* v. *Murphy,* 412 U.S. 291, 295, 93 S. Ct. 2000, 2003, 36 L. Ed. 2d 900 (1973) ('[T]he scope of the warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement.')."

In the case *sub judice,* all items seized with the exception of the two excluded spent bullets had been observed in plain view by the first officer.

We affirm the holding of the court of appeals in that the items which were not suppressed by the trial court were all in plain view. It makes no difference whether this evidence was collected immediately upon view by the first officer or hours later after the scene had been secured and photographed. The plain view doctrine remained applicable.

In sum, we hold that the defendant was not denied his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## VII

Appellee, in his final proposition of law, asserts that his retrial was barred on double jeopardy grounds. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects a criminal defendant from repeated prosecutions for the same offense. *United States* v. *Dinitz* (1976), 424 U.S. 600, 606. It is an assurance that an accused has the "* * * right to have his trial completed by a particular tribunal * * *." *Wade* v. *Hunter* (1949), 336 U.S. 684, 689.

In the instant case, the appellee obtained a reversal of his first conviction by the appellate court on a number of grounds, including prosecutorial misconduct. The defendant attempts to extend the reasoning of the United States Supreme Court in *Oregon* v. *Kennedy* (1982), 456 U.S. 667, to this situation. The court in *Kennedy, supra,* stated:

"Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. * * *" *Id.* at 675-676.

The appellate court in *State* v. *Sage* (Nov. 3, 1983), Franklin App. No. 82AP-983, unreported, stated that the prosecutorial misconduct was determined to be of such a nature as to deny the accused a fair trial, but did not state that it was calculated to force the accused to seek a mistrial. The court in *Kennedy, supra,* stated further that:

"* * * [o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676.

We note the holding in *Robinson* v. *Wade* (C.A. 5, 1982), 686 F. 2d 298, 307-308, wherein the court found no difference whether a mistrial was granted in the trial court or whether there was reversal on appeal — where the basis for both was prosecutorial overreaching.

*Kennedy, supra,* is inapplicable to the case at bar for two reasons: first, the prosecutorial misconduct in the initial trial was not calculated to goad the accused into seeking a mistrial and, second, the retrial was the result of reversal on appeal of his prior conviction. Therefore, this court will rely upon its holding in *State* v. *Liberatore* (1982), 69 Ohio St. 2d 583, 591, 23 O.O. 3d 489, 494, 433 N.E. 2d 561, 567, which reads:

"Retrial for the same offense after reversal of a prior conviction on appeal does not constitute a violation of the constitutional provision prohibiting double jeopardy. See *Foran* v. *Maxwell* (1962), 173 Ohio St. 561, 563; *Sutcliffe* v. *State* (1849), 18 Ohio St. 469; *United States* v. *Smith* (C.A. 6, 1978), 584 F. 2d 759, 761, certiorari denied 441 U.S. 992. A reversal of a judgment in a criminal case merely places the state and the defendant in the same position as they were in before trial."

This court holds that double jeopardy principles do not bar retrial where an appellate court reverses a conviction based upon prosecutorial misconduct when such conduct was not calculated to goad the defense into seeking a mistrial.

The judgment of the court of appeals is reversed as to its rulings that failure to instruct the jury as to the lesser offense of involuntary manslaughter was reversible error and that the admission of the victim's mother's testimony was an abuse of discretion on the part of the trial court. The judgment is affirmed as to its rulings on all other issues.

*Judgment reversed in part*
*and affirmed in part.*

MOYER, C.J., LOCHER, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.

SWEENEY, J., concurs in part and dissents in part.

RESNICK, J., of the Sixth Appellate District, sitting for HOLMES, J.

SWEENEY, J., concurring in part and dissenting in part. While I agree with the language set forth in the second paragraph of the syllabus, I disagree with the majority's conclusion in Part II that even if the testimony elicited from the decedent's mother constituted error, such error was harmless beyond a reasonable doubt.

The majority asserts that "[t]he letter to appellee was sexually explicit; hence, if the decedent never talked in this way to her mother, then she probably would not have voluntarily and freely written a suicide note on the reverse side of the letter." With all due respect to the majority, I fail to see the logic of this statement.

As noted by the court of appeals below, Mrs. Wanner's testimony revealed (1) that the decedent discussed boyfriends with her mother, and (2) that the decedent never discussed any boyfriend with her mother in terms such as those employed in the suicide note. While the decedent may not have discussed her relationships with boyfriends with her mother in the terms implemented in the suicide note, it is extremely doubtful that most any daughter would discuss intimate details with her mother concerning sexual relationships. Simply because decedent did not use such terms in describing relationships to her mother on prior occasions, it does not necessarily follow that decedent did not feel that way towards appellee. The appellate court below correctly analyzed Mrs. Wanner's testimony in the following manner:

"The testimony suggests that, had Wanner actually held such feelings towards any individual, she would have related the information to her mother. Without any foundation, this position assumes that Wanner freely communicated her feelings to her mother without withholding any information. By not having discussed any boy in terms of the note's language, the state seeks to infer the following: (1) that the note did not reflect Wanner's true feelings and was not written by her; (2) that since Wanner did not write the note she did not intend to commit suicide; (3) that Wanner did not commit suicide; and (4) that appellant killed Wanner."

In my view, the testimony elicited from Mrs. Wanner was irrelevant and prejudicial to appellee, and thus deprived him of receiving a fair trial. Unlike the majority, I cannot agree that such testimony was harmless beyond a reasonable doubt, because I do not view the other evidence admitted concerning appellee's guilt to be "overwhelming." Therefore, I would affirm the court of appeals on this issue, and remand the cause for a new trial.

## APPENDIX A

Donni, Mom and Dad I'm sorry
to hurt you I Love you Both Very
Much. I didn't want
to die I wanted to
keep going to school But
somewhere along the line I
made some Bad mistakes. Oh,
I wish I would of listened
to everything you said to
me before. ~~I~~ I just wanted
to let you know I loved you All
of you very much. I hope I go
to heaven. Please remember me
in your prayers.

I wanted to die
with Roy.

Love Always,
Cathy

## APPENDIX B

To my little baby Roy

I met the warmest & nicest person in my life. He's sexy & beautiful. Words are hard to describe how I feel about him. Within himself he radiates a certain charisma. Undescribable. When I make love to him its beautiful. I want his whole self. Total Person. When he touches me I feel warm all over & inside. I'll give my whole self to him. Because I love this terrific guy. I want him for me. For the rest of my life.

I'll Love with all my heart my little honey.

Your Baby