**CITY OF AKRON**

v.

**HEAD.**

Akron Municipal Court.

No. 95 CRB 7101.

Decided Nov. 8, 1995.

*Rhonda Hendrix,* for plaintiff.

*Edward T. Smith,* Summit County Assistant Public Defender, for defendant.

MONTE E. MACK, Judge.

This matter came to trial before the court on September 1, 1995. Both parties stipulated to the following facts.

The defendant, James Horace Head ("Jim") met Beverly Pavlick ("Bev") in 1986 and the two began dating. The relationship was marked by shifting periods of romance and friendship. For a time in early 1995, the couple lived together at Jim's house. However, this era of the relationship proved short-lived and Bev moved to her daughter's house in early April, claiming that she needed "space." Whatever Bev's true motive for the move was, we know that she had discovered lumps in her breasts and was experiencing "trouble" with both work and family.

When Bev moved, the relationship apparently ground to a halt. However, Jim maintained hope that they might rekindle the relationship. With that thought in mind, Jim invited Bev to lunch at his house on June 10, 1995, and Bev accepted. However, when June 10 arrived, Bev abruptly cancelled the luncheon. Consequently, Jim, who was taking pain medication for a back injury, spent the day of the 10th drinking beer and watching TV. That evening, Jim called Bev's daughter, Kara. Kara told Jim that Bev would be visiting her house later that evening, and, with Kara's permission, Jim went to her house to wait for Bev.

When Bev arrived, she appeared intoxicated and was carrying a six-pack of beer.[1] Bev didn't stay long. Apparently, Kara made a comment which upset Bev, and Bev left the house angry. Jim followed Bev outside, and the couple went to Jim's house. Once at Jim's house, the couple smoked a marijuana cigarette and talked about their relationship until Kara's boyfriend, Tom, came and attempted to reconcile the argument between Bev and Kara. Sometime during Tom's conversation with Bev, she exclaimed, "I'll just go get the gun and shoot myself!" Soon thereafter Tom left Jim's house.

With Tom gone, Jim and Bev discussed their relationship again. Jim told Bev how much he loved her, missed her, and wanted her to be with him again. This apparently struck an emotional nerve in Bev, and she apologized for hurting Jim and blamed her problems at work for the downfall of their relationship. Bev told Jim that she did not want to hurt him anymore and wanted to kill herself. Jim responded that Bev had not hurt anyone and that if she was going to kill herself, she would have to kill him first because he could not live without her. Bev agreed to kill Jim and then kill herself. Under the suicide pact, Bev was to place four bullets (two to kill Jim and two to kill Bev) in Jim's .22 caliber pistol, kill Jim, then turn the gun on herself. When the investigating officer asked Jim how he felt, knowing that he and his loved one were going to die, Jim replied that he didn't care. Jim did not believe that Bev would kill herself. However, Jim believed that if Bev did kill herself, she would kill him first; in that case, Bev's death would not matter to Jim. It appears to the court that Jim simply didn't care whether he lived or died as a result of the suicide pact.

---

1. The coroner's report found 0.03 percent ethanol by body weight in Bev's bloodstream.

Upon Bev's request, Jim went to another room to get his pistol and a box of .22 caliber ammunition. When Jim returned and sat in a chair next to Bev, she grabbed the gun from his lap. Bev discovered that the gun was not loaded and demanded the bullets. Jim opened the ammunition box, handed Bev four bullets, and watched her load and cock the gun. Jim closed the ammunition box, which diverted his attention long enough for Bev to raise the pistol to her head, and pull the trigger, killing herself.[2]

■ The only issue at bar is whether these facts constitute negligent homicide. This is a case of first impression in Ohio.

Under the Ohio Revised Code, it is a misdemeanor of the first degree to negligently cause the death of another by means of a firearm. R.C. 2903.05 states:

"(A) No person shall negligently cause the death of another by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code.

"(B) Whoever violates this section is guilty of negligent homicide, a misdemeanor of the first degree."

A firearm is both a "deadly weapon" and "dangerous ordnance" under the Ohio Revised Code. R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried or used as a weapon." R.C. 2923.11(K)(4) defines "dangerous ordnance" as "[a]ny firearm * * * and the ammunition for that weapon[.]"

■ The standard of culpability for "criminal negligence" is "a substantial lapse [of] due care" that causes a "fail[ure] to perceive or avoid a risk that [the] conduct may cause a certain result or may be of a certain nature." R.C. 2901.22(D). Conduct that amounts to a "material forsaking of [an] expected concern, a vital abandonment of required care, or real divergence of appropriate concern" is criminally negligent conduct. *State v. Lovejoy* (1976), 48 Ohio Misc. 20, 26, 2 O.O.3d 320, 324, 357 N.E.2d 424, 428.

In *State v. Bier* (1979), 181 Mont. 27, 591 P.2d 1115, the Montana Supreme Court affirmed a conviction for negligent homicide on a factual pattern very similar to the one at bar. In *Bier*, the defendant's wife stated that she wanted to kill herself. Defendant, believing that his wife would not take her own life, cocked a loaded pistol and placed it within his wife's reach. The court reasoned

2. The police investigation and Summit County Coroner's report concluded that Bev's death was the result of a self-inflicted gunshot wound.

that the defendant's act in placing a cocked, loaded pistol within reach of his suicidal wife was a gross deviation from a reasonable person's required standard of care.

In the case at bar, the court's first inclination was to follow the Montana Supreme Court. Jim's actions amounted to a "material forsaking of an expected concern" [3] constituting a substantial lapse of due care to perceive or avoid the risk that his conduct would cause Bev's death. R.C. 2901.22. However, the Committee Comment to R.C. 2903.05 indicates that the Ohio legislature originally intended the section to apply to a parent whose child kills herself while playing with the parent's firearm, a hunter who kills another, or a person who points a firearm at another in jest and the firearm accidentally discharges. The comment does not address "assisting" or "aiding and abetting" suicide. R.C. 2903.05 (Committee Comment).

Moreover, suicide is not a crime in Ohio. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, syllabus; *Blackburn v. State* (1872), 23 Ohio St. 146, 153. Thus, "aiding and abetting" or "assisting" a suicide victim cannot be a crime unless enumerated by the state legislature.[4] *Id.* Some thirty state legislatures have enacted laws addressing "aiding and abetting" or "assisting" suicide.[5] However, the Ohio legislature remains silent on the issue.

In *Blackburn v. State*, the defendant provided poison to his wife who, in taking the poison, killed herself. Some evidence indicated that the defendant had entered into a suicide pact with his wife, but had failed to kill himself. The trial court refused an instruction regarding the suicide pact, and the jury convicted the defendant of second degree murder. The Ohio Supreme Court reversed and

---

3. *State v. Lovejoy* (1976), 48 Ohio Misc. 20, 2 O.O.3d 320, 357 N.E.2d 424.

4. The court recognizes that aiding and abetting or assisting suicide was a crime at English common law. However, Ohio does not recognize the crime today. See *State v. Sage* and *Blackburn v. State.*

5. See Alaska Stat. 11.41.120 (1989); Ariz.Rev.Stat.Ann. 13–1103 (1989); Ark.Code Ann. 5–10–105 (Michie 1987); Cal.Penal Code 401 (West 1970); Conn.Gen.Stat. 53a–56 (West 1981); Del.Code Ann., Title 11, Section 645 (1981); Fla.Stat.Ann. 782.08 (West 1976); Kan.Stat.Ann. 21–3406 (1981); Me.Rev.Stat.Ann. Title 17–A, Section 204 (1982); Minn.Stat.Ann. 609.215 (West 1964); Miss.Code Ann. 97–3–49 (1972); Mo.Ann.Stat. 565.021 (Vernon 1979); Mont. Code Ann. 45–5–105 (1981); Neb.Rev.Stat. 28–307 (1979); N.J.Stat.Ann. 2C:11–6 (West 1981); N.M.Stat.Ann. 30–2–4 (1978); N.Y.Penal Law 120.30 (McKinney 1975); Okla.Stat. Ann., Title 21, Section 813–818 (West 1958 and Supp. 1981–1982); 18 Pa.Consol.Stat.Ann. 2505 (Purdon 1973); P.R.Laws Ann., Title 33, Section 1385 (1969); S.D.Codified Laws Ann. 22–16–37 (1979); Tex.Penal Code Ann. 22.08 (Vernon 1974); Wash.Rev.Code Ann. 9A.36.060 (1977); Wis.Stat.Ann. 940.12 (West 1982). For a general discussion of criminal liability of survivors of suicide pacts, see Annotation (1985), 40 A.L.R.4d 690.

remanded. The court reasoned that suicide was not a crime in Ohio; in that case, the defendant argued as follows:

"If two agree that they will each commit suicide, the agreement of each being the inducement of the other to do the suicidal act, and one of them, in pursuance of the agreement, does the suicidal act, and dies, the other, for some cause, not attempting to kill himself, or, attempting to do so, failing to take his own life, the survivor, for reasons already given, even though present at the commission of the suicidal act by the other, is not guilty of any crime or offense known to the laws of Ohio." *Blackburn v. State* (1872), 23 Ohio St. 146, at 153–154.

Moreover, the Ohio Supreme Court, in *Sage*, held that a defendant's "assertion that a death was the result of a mutual suicide pact is a complete defense to *any* crime by the survivor to the pact." (Emphasis added.) *Sage*, 31 Ohio St.3d at 178, 31 OBR at 379, 510 N.E.2d at 347.

The court questions the position taken by the Ohio Supreme Court and General Assembly. However, despite our conclusion that R.C. 2903.05 should apply to the case *sub judice*, it is not the place of this court to overrule the Ohio Supreme Court or to act as the Ohio legislature. The court is bound by the Ohio Supreme Court's decisions in *Sage* and *Blackburn*, *supra*.

WHEREFORE, it is hereby ORDERED, ADJUDGED AND DECREED that the defendant, James Horace Head, should be, and hereby is found not guilty of negligent homicide as charged under R.C. 2903.05.

*Defendant not guilty.*