OPINION
Defendant-appellant Lawrence Edward Black appeals his convictions and sentences entered by the Stark County Court of Common Pleas on one count of rape and one count of domestic violence following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On February 25, 1999, the Stark County Grand Jury indicted appellant on one count of rape, in violation of R.C. 2907.02, and one count of domestic violence, in violation of R.C. 2919.25(A). At his arraignment on March 5, 1999, appellant entered a plea of not guilty to the charges. The matter proceeded to trial by jury on May 6, 1999. At trial, Officer Roy Tittle of the Alliance Police Department testified he responded to a call at 102 Nantucket, Apt. B, Alliance, Ohio during the afternoon hours of February 19, 1999. Upon his arrival, the officer found Jennifer Arnott, who advised him she and appellant, her live-in boyfriend, had been involved in a dispute. Officer Tittle observed physical bruises on Arnott's arm and forehead. Arnott informed the officer appellant had beaten, raped, and abused her for a period of two days. Officer Tittle described Arnott as upset, shaking, crying, and very paranoid. After gathering this information, Officer Tittle contacted the Detective's Bureau. Thereafter, the officer left Arnott and proceeded across the apartment complex to locate appellant. The officer observed appellant and ordered him to the ground. Officer Tittle instructed appellant to get on the ground several times before appellant complied. Detective John Leech of the Alliance Police Department arrived at the Nantucket address in response to Officer Tittle's request for backup. At the scene, the detective observed appellant prone on the ground. The detective ultimately placed appellant under arrest. After appellant was transported to the police station, Detective Leech proceeded to the crime scene where he and his partner collected evidence, including a towel, a glove, a tire repair tool, and a knife. The detectives also photographed the victim and the living room carpet. Detective Leech returned to the station and interviewed appellant after advising him of his Miranda Rights. Jennifer Arnott testified she met appellant in June, 1997, when they were both living in North Carolina. Arnott stated she and appellant were engaged to be married at one time. She noted the two had lived together off and on throughout their relationship. In October, 1998, Arnott relocated to Canton, where she has family. Appellant later joined Arnott and her son in Ohio, and the couple resided together from December 29, 1998, until February, 1999. Arnott recalled she was working her second day on the job at InfoCision in Uniontown, Ohio, on February 17, 1999, when her trainer informed her appellant had called and advised her she needed to return the call as there was an emergency. Arnott telephoned appellant, who immediately accused her of having an affair with Elgin Morris, a resident in the apartment complex where she and appellant lived. Appellant informed Arnott the police had taken custody of her son and advised her to return home. After calling her son's school and learning he was still there, Arnott left work and picked up her son. Arnott was scared to return to her apartment because of appellant's state of mind, so she visited a friend. Although she called the apartment several times, appellant did not answer. At approximately 2:00 p.m., Arnott and her son returned to the apartment. Appellant eventually returned to the apartment and proceeded upstairs where he gathered some clothing. When he came downstairs, he informed Arnott the relationship was over. Arnott denied the affair with Morris, but appellant proceeded to hit her in the head between five and ten times. Arnott fell to the ground and begged appellant to stop. Appellant ordered her into the kitchen where he demanded she sit down. Appellant, who was wearing fingerless gloves, brandished a steak knife and threatened to cut up Arnott. Appellant proceeded to hit Arnott again and, as he moved his hand away, he pulled out a clump of her hair. Appellant ordered Arnott to get a pair of scissors and cut her hair. He advised her if she did not comply with his order, he would cut her hair and warned he might slip and cut her throat. Arnott then cut about five inches off of her hair. Appellant ordered Arnott to proceed to the bedroom where he instructed her to remove her clothing. Appellant demanded she confess to the affair with Morris, threatening to beat her or kill her if she did not do so. During this confrontation, appellant brandished a tire repair tool, which he held approximately 1 1/2 inches from Arnott's face. Appellant threatened to poke Arnott's eye out when she pushed the tool away from her face. When the telephone rang, appellant proceeded downstairs, but instructed Arnott to stay in the bedroom. Sometime thereafter, appellant allowed Arnott to dress and return downstairs. When appellant eventually left the apartment, Angela Hazeltine, Arnott's girlfriend, appeared, but only stayed a short time. Appellant returned after approximately one half hour. Hazeltine visited Arnott and appellant later that evening. While the three were sitting in the living room, appellant commented to Hazeltine, "I bet you think I'm a bad person now because I hit her." After Hazeltine left, appellant told Arnott to return some rental videos to a local store. Appellant specified the time frame in which he expected her to complete this task. Arnott admitted she did not contact the police when she was out of the apartment, explaining she was afraid of the repercussions. Arnott, appellant, and her son watched movies that evening. Throughout the evening, appellant taunted Arnott, stating he wanted to cut her up and throw her body into the river where no one would ever find it. Arnott and her son eventually fell asleep despite appellant's threats he would kill her if she did. When Arnott awoke on February 18, 1999, appellant was not at the apartment, however, he arrived shortly thereafter. Appellant again accused Arnott of having an affair with Morris. Appellant ordered Arnott's son upstairs to watch television. Appellant then informed Arnott she was going to have anal sex with him. Appellant laid Arnott over the back of the couch and proceeded to anally penetrate her. Appellant forced himself on Arnott for twenty minutes. During this attack, Arnott screamed in pain. She could hear her son screaming for her from the upstairs bedroom. When appellant stopped, blood and stool extricated from Arnott's rectum onto a towel which appellant had placed under them. Appellant allowed Arnott to take a bath, however, he placed salt and alcohol in the water, explaining it would make her tougher or stronger. When she finished her bath and returned downstairs, she found appellant speaking with Hazeltine. Arnott heard appellant tell Hazeltine he beat Arnott up in order to make her tougher. When Arnott sat down in a chair, appellant forced her to sit between his legs. Arnott looked at Hazeltine and mouthed the words, "Come back." The following morning, February 19, 1999, appellant, Arnott, and her son traveled into Canton where appellant conducted personal business. When they returned to the apartment, appellant advised Arnott she had five seconds to get upstairs because he was going to have anal sex with her again. Arnott grabbed her son, told appellant they were going for a walk, and left the apartment. After Arnott observed appellant leave the apartment complex in her vehicle, she proceeded to Hazeltine's apartment where she telephoned the police. Arnott was ultimately transported to Alliance Community Hospital. Angela Hazeltine testified appellant arrived at her apartment at approximately 10:00 a.m. on February 17, 1999, stating Arnott was cheating on him and he planned to take her son to the police station. Appellant commented to Hazeltine someone was going to get hurt that day. At approximately 3:00 p.m., Hazeltine visited Arnott and appellant's apartment, and found Arnott quite upset. Hazeltine observed Arnott's hair in a trash can and on the kitchen table. Hazeltine also noticed Arnott's arm was bruised and swollen. Appellant advised Hazeltine he beat up Arnott in order to make her stronger. Later that evening, Hazeltine returned to the apartment to check on Arnott, who again was upset and scared. The following day, February 18, 1999, Hazeltine appeared at the apartment. Appellant informed her Arnott was in the bathtub. Hazeltine observed spots of blood on the floor. Appellant, upon realizing Hazeltine had noticed the blood, informed her Arnott had her menstrual period and then proceeded to clean the floor. Hazeltine testified Arnott appeared scared when she came downstair. Hazeltine also noticed Arnott's facial expressions indicated she was in a great deal of pain. When appellant was not looking, Arnott mouthed to Hazeltine to come back after he left. Hazeltine testified she saw Arnott the following day, February 19, 1999, when Arnott appeared at Hazeltine's apartment with her son. Thereafter, Hazeltine telephoned the police. After the police arrived, Arnott was transported to the hospital. Dr. Todd Lilje, who specializes in emergency medicine, testified he treated Arnott in the Emergency Room of the Alliance Community Hospital on the afternoon of February 19, 1999. Dr. Lilje recalled Arnott appeared emotionally distraught and informed him she had been assaulted and sodomized. Through his physical examination, Dr. Lilje found Arnott had multiple areas of bruising on her body and extremities, and had several rectal tears which were quite significant. Dr. Lilje stated he attempted to conduct an examination of Arnott's anal ring, however, he was unable to do so because the area was so tender and painful. The doctor further testified the rectal tears he observed were jagged, explaining such tears were not the result of normal physiological events. Because he did not observe any internal tears to the rectum, the doctor concluded the tears were caused by an outside force. The doctor further opined the tears were not the result of a hemorrhoidechtemy Arnott had undergone in August, 1998. Appellant testified on his own behalf. He testified on the morning of February 17, 1999, after Arnott had left for work, he received a telephone call from Elgin Morris. According to appellant, Morris informed him that he [Morris] was Arnott's lover. Appellant immediately telephoned Arnott at her job and informed her he would not pick up her son at daycare. Thereafter, appellant proceeded to speak with several of Arnott's friends about the alleged relationship between Arnott and Morris. When appellant returned to the apartment at approximately 5:00 p.m., he confronted Arnott about the relationship. Appellant admitted he hit Arnott in the head and arm after she admitted to the affair. Thereafter, appellant left the apartment and went to the Alpine Motel, where he spent the night. Appellant testified he returned to the apartment the following morning, February 18, 1999, and apologized to Arnott for hitting her. The two discussed reconciliation. According to appellant, Arnott told appellant she would do anything to win back his trust. Appellant suggested they have anal sex because Arnott had her menstrual period. Appellant then described the consensual encounter. Later that afternoon, appellant, Arnott, and her son, ran errands. During the early evening, Hazeltine visited for a few minutes. Appellant testified the following day, February 19, 1999, he was away from the apartment most of the day on personal business. Madau Shah, the owner of the Alpine Motel, testified appellant checked into the motel at approximately 5:00 p.m. on February 17, 1999. Shah stated he did not see appellant until the following morning when appellant checked out around 10:00 a.m. After hearing all the evidence and deliberations, the jury found appellant guilty of one count of rape and one count of domestic violence as charged in the indictment. The trial court sentenced appellant to a determinate term of imprisonment of nine years on the rape count and a term of six months on the domestic violence count. The trial court ordered the sentences be served concurrently. The trial court memorialized the verdicts and sentences in an Entry filed May 14, 1999. It is from these convictions and sentences appellant prosecutes this appeal, raising the following assignments of error:
 I. THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY NOT ALLOWING CROSS EXAMINATION PERTAINING TO PRIOR BAD ACTS.
 II. THE TRIAL COURT ERRED IN NOT ORDERING A MISTRIAL FOLLOWING IMPROPER CLOSING ARGUMENT BY PROSECUTION.
 III. THE JURY VERDICT FINDING APPELLANT GUILTY OF RAPE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
 I
In his first assignment, appellant maintains the trial court erred in prohibiting him from cross examining Jennifer Arnott regarding prior bad acts. The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion, i.e., unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151, 157. Evid.R. 103(A)(1) specifically provides as follows: (A) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.
See, White v. Richmond (1842), 16 Ohio St. 6; State v. Grubb (1986), 28 Ohio St.3d 199; State v. Wilson (1982), 8 Ohio App.3d 216. Appellant submits Arnott put her credibility at issue when, during her direct examination, she testified her only involvement with the law was a petty theft conviction. On cross-examination, appellant wished to question Arnott "regarding her prior involvement with the law in North Carolina." Appellant's Brief at 4. Specifically, appellant sought to inquire of Arnott relative to an investigation conducted by Social Services in North Carolina as to a custody order she allegedly disobeyed. The trial court prohibited such an inquiry, stating, "I don't believe that it is that probative of this as it relates to the credibility. She has admitted to having a prior conviction and I think any probative value would be outweighed by its prejudice and it's just not going to happen. So proffer what you would ask." T., Vol. I at 162. Appellant maintains the trial court should have permitted such an inquiry pursuant to Evid.R. 608, which allows cross-examination concerning a witness's prior acts when those acts concern the witness's character for truthfulness or untruthfulness. Evid.R. 608(B) provides: (B) Specific instances of conduct
Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
The giving of testimony by any witness, including an accused, does not operate as a waiver of the witness's privilege against self-incrimination when examined with respect to matters that relate only to the witness's character for truthfulness.
The cross-examination regarding prior acts of misconduct must relate directly to the truthfulness of the witness. State v. Shields (1984), 15 Ohio App.3d 112. The witness may not be impeached by evidence which merely contradicts her testimony on a matter which is collateral and not material to the issue in the trial. State v. Bogg (1992), 63 Ohio St.3d 418. We find, even if appellant were allowed to cross-examine Arnott relative to the North Carolina custody order, her answer would not necessarily be contradictory to her statement on direct examination regarding the petty theft conviction. Moreover, Arnott could have assumed the State's question related only to criminal matters. We find appellant's inquiry was not aimed at Arnott's character for truthfulness or untruthfulness, but rather was intended to defame Arnott in front of the jury concerning a matter that was collateral and not material to the issues in the trial. We find the prejudice of this line of questioning clearly outweighed the probative value, particularly when Arnott admitted to the petty theft conviction. Accordingly, we find the trial court did not abuse its discretion in prohibiting appellant from engaging in such an inquiry on cross-examination. Appellant's first assignment of error is overruled.
 II
In his second assignment of error, appellant contends the trial court erred in failing to order a mistrial following improper closing arguments by the prosecution. During closing arguments, the prosecutor referred to appellant as a violent man. The trial court sustained appellant's objection to the comment and instructed the jury to disregard such. Next, the prosecutor referred to appellant's previous conviction for felony assault. The trial court noted, "Ladies and gentlemen, I will be giving you an instruction as to the limited purpose for which you can consider the prior conviction. Disregard the comments of counsel." T., Vol. II at 303. Appellant did not request a mistrial. Because the trial court sustained appellant's objection to the first comment and instructed the jury to disregard such statement, and instructed the jury relative to their consideration of a prior conviction, and because appellant did not request a mistrial, we find the trial court did not abuse its discretion in failing to sua sponte order a mistrial. Appellant's second assignment of error is overruled.
 III
Herein, appellant raises a manifest weight of the evidence claim. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997), 78 Ohio St.3d 380, 387 citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. Essentially, appellant argues the verdicts were against the manifest weight of the evidence because Arnott's behavior did not make any sense. Appellant questioned why Arnott did not telephone the police when she left the apartment with her son to return videotapes. Appellant also questioned why Hazeltine did not call the police. Additionally, appellant noted Dr. Lilje's testimony did not establish the anal intercourse was not consensual. At trial, Arnott testified appellant allowed her to leave the apartment with her son to return videotapes, however, he ordered her to return within a specific period of time. Arnott testified she feared appellant's repercussions if she telephoned the police and waited for their arrival. Hazeltine, likewise, testified she feared the repercussions Arnott would suffer at appellant's hands if she telephoned the police. Although Dr. Lilje conceded he could not determine whether or not the anal intercourse was consensual, he did testify regarding the force which would have been necessary to cause the injuries which resulted therefrom. Based upon the facts noted supra, and the entire record, we do not find the jury's verdict was against the manifest weight of the evidence. The jury was free to accept or reject any or all of the testimony of the witnesses and assess the credibility of those witnesses. Arnott's testimony alone was sufficient to support the convictions. We do not disagree with the jury's resolution of the evidence. Appellant's third assignment of error is overruled. The convictions and sentences of the Stark County Court of Common Pleas are affirmed.
 __________________ HOFFMAN, P.J.
By: Hoffman, P.J. Edwards, J. and Reader, V.J. concur