UNIVERSITY MEDNET, Appellee,

v.

BLUE CROSS AND BLUE SHIELD OF OHIO, Appellant.

[Cite as *Univ. Mednet v. Blue Cross & Blue Shield
of Ohio* (1997), 126 Ohio App.3d 219.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 71172.

Decided Nov. 13, 1997.

220

222

*Vorys, Sater, Seymour & Pease, Anthony J. O'Malley, Bruce P. Batista, Thomas B. Ridgley* and *David J. Tocco,* for appellee.

*Climaco, Climaco, Lefkowitz & Garofoli, John R. Climaco* and *Debra J. Horn,* for appellant.

———

ABOOD, Judge.

This is an appeal from a judgment of the Cuyahoga County Court of Common Pleas which denied the application to vacate an arbitration award filed by appellant Blue Cross and Blue Shield of Ohio and entered judgment on the arbitration award in favor of appellee University Mednet in the amount of $14,400,000. Appellant sets forth the following assignments of error:

"I. The lower court erred to the prejudice of defendant-appellant in overruling its motion to vacate the arbitration award and in confirming the arbitration award.

"A. Arbitration award must be vacated when the record shows that the arbitration award gives a double recovery to appellee and therefore is against public policy.

"B. An arbitration award must be vacated when the record shows that the arbitration award gives a double recovery to appellee and therefore is a manifest error.

"C. An arbitration award must be vacated when the record shows that the arbitrators exceeded their authority by not resolving the impact of the award of future damages on the parties' ongoing business relationship thus making the award ambiguous, indefinite and not final.

"D. An arbitration award must be vacated when the record shows that the arbitrators exceeded their authority by not resolving all outstanding issues submitted to them so that the award is indefinite and not final.

"II. The lower court erred to the prejudice of defendant–appellant in failing to rule on or allow defendant–appellant the opportunity to secure or proffer evidence in support of its motion to vacate the arbitration award."

The facts that are relevant to the issues raised on appeal are derived from an extensive record that includes, but is not limited to, a 1,470-page arbitration transcript, the parties' collective bargaining agreement, the parties' post-hearing briefs, the parties' subsequent motions to the trial court, various correspondences between the parties, and the parties' respective appellate briefs.

In 1978, the Euclid Clinic Foundation, an association of physicians, and the insurance provider Blue Cross formed a business organization which would later be called HMO Health Ohio. The Euclid Clinic Foundation subsequently became University Mednet ("Mednet") and Blue Cross became Blue Cross and Blue Shield Mutual of Northern Ohio, Inc. ("BCBS"). Generally, Mednet provided the medical care for HMO Health Ohio members while BCBS was responsible for the sales activities and marketing of HMO Health Ohio. Initially, the parties operated pursuant to annual contracts with Mednet functioning on a "fee-for-service" basis. However, as their membership base grew in size, the parties began negotiations regarding a joint ownership of HMO Health Ohio.[1]

In 1985, Mednet entered into an agreement with BCBS ("the contract") that was to run through December 31, 1999. The contract, which has been amended from time to time throughout its existence, provided, among other things, that Mednet would use the plan's network of physicians as the exclusive providers of all covered medical services provided to members of HMO Health Ohio in an area of eastern metropolitan Cleveland extending eastward to the Pennsylvania border and north of Summit County (the "Cleveland East" region). BCBS would provide the infrastructure to operate HMO Health Ohio in the Cleveland East

---

1. Whether the parties actually intended a "joint venture" was an issue disputed by the parties. By implication, the arbitration award held that a "joint venture" did not exist. For purposes of this opinion, the business entity/relationship is not a factor in our review.

region, maintain its license, market it, enroll persons as members, and collect premiums from members. The parties agreed to a capitation method of payment whereby BCBS would pay Mednet a flat fee per month for each member entitled to receive health care services from HMO Health Ohio.[2]

When the parties originally entered into their agreement, Mednet was a physician-owned, not-for-profit foundation. In February 1989, however, in order to comply with Ohio's corporate practice of medicine laws, Mednet was acquired and became a wholly owned subsidiary of University Hospitals Health System ("University"), a professional corporation. Although University is in competition with the integrated health care delivery system of which BCBS is a member, this acquisition did not violate the terms and conditions of the parties' 1985 contract, which contained a "Nonexclusive Participation" provision that states:

"This Agreement in no way restricts BCBS or [Mednet] from participating in other HMO, PPO, IPA or similar plans or arrangements, whether within or without the [Cleveland East] area."

From 1985 through 1993, HMO Health Ohio's subscriber base grew and was profitable. Initially, BCBS provided Mednet with its own marketing staff but in 1989 the staff merged into one sales department under BCBS. Regardless of this change, BCBS continued to effectively market HMO Health Ohio pursuant to the parties' 1985 contract and, by 1993, the membership grew to approximately 68,000 members.

In the summer of 1993, Mednet began considering a move out of Meridia Euclid Hospital, which was affiliated with the Cleveland Clinic Foundation and BCBS. The proposed move would require HMO Health Ohio members to use University Hospital and/or its affiliates, who again were in competition with the integrated health care delivery system of which BCBS is a member. Mednet publicly announced its decision to move in May 1994. By this time, BCBS had already begun forming its own integrated health care system with the Meridia Hospital System. On May 9, 1994, it publicly announced its intention to create and market another health maintenance organization called "Super Blue HMO" to operate in the Cleveland East region. Again, due to a "Nonexclusive Participation" clause, the creation and marketing of Super Blue HMO was not in violation of the terms and conditions of the 1985 contract.

Following these actions by the parties, the relationship between them quickly deteriorated and a bitter public relations battle ensued. On May 6, 1994, BCBS wrote Mednet a letter in which it requested an executive meeting to discuss what it considered to be material breaches of the 1985 contract by Mednet. In the

2. BCBS also paid Mednet a quarterly hospital incentive payment.

letter, BCBS claimed that Mednet had (1) directed HMO Health Ohio members to providers who do not have an appropriate contractual relationship with HMO Health Ohio, (2) misrepresented the nature of HMO Health Ohio members' obligation under their subscriber certificates, and (3) otherwise failed to comply with the parties' 1985 contract.

On May 10, 1994, BCBS sent another correspondence to Mednet concerning instructions that member service representatives of Mednet were giving to HMO Health Ohio members regarding an advertisement that had been released by Meridia Health Systems concerning the use of Meridia Euclid Hospital by HMO Health Ohio members. BCBS provided with this letter what it considered to be an appropriate response to questions by HMO Health Ohio members concerning whether HMO Health Ohio was pulling out of Meridia Euclid Hospital.

On June 3, 1994, BCBS again wrote to Mednet and requested that an executive meeting be held no later than June 9, 1994. In addition to its prior allegations, BCBS submitted the following issues that it believed had to be resolved at that meeting (1) participation in Medicaid, (2) the relationship between BCBS and the Medical Director of HMO Health Ohio, (3) Mednet's attempt to move to University Health Care Systems, which BCBS considered to be a breach of their 1985 contract, (4) the treatment of HMO Health Ohio current patients, and (5) past communications by Mednet to HMO Health Ohio members that compared the costs of services of University Hospital Systems to those of Meridia Euclid Hospital and Lake Hospital.

On June 9, 1994, Mednet made its formal request for arbitration in accordance with Article XIV of the 1985 contract and demanded an inspection of books and records. Mednet claimed, among other things, that BCBS failed to provide both the marketing plans described in the 1985 contract and the data and financial records necessary to resolve the economic issues existing between the parties and claimed that BCBS had failed to perform its duties and meet its obligations under the contract.

In its demand for arbitration, Mednet also raised the following specific economic issues:

1. that BCBS failed to apply discounts to services purchased from contract providers,

2. that BCBS improperly charged Mednet for certain HCPCS codes,

3. that Mednet incurred improper charges relating to terminated members,

4. that BCBS made duplicate payments to the same provider for the same service,

5. that BCBS failed to properly generate detailed code data from which Mednet could scrutinize costs associated with each particular procedure,

6. that BCBS failed to properly document retroactive terminations, which resulted in BCBS withholding over $500,000 in capitation payments,

7. that BCBS agreed to pay facility charges for mammography and ultrasound but failed to do so,

8. that BCBS agreed to subsidize Mednet's entry in the Rockside Road facility through a formula which needs further accounting, and

9. that BCBS owes Mednet capitation payments for services rendered at the Independence Family Practice.

Mednet also submitted and/or incorporated for arbitration review any and all controversies raised in the three letters previously sent from BCBS to Mednet.

On October 14, 1994, BCBS filed a counter-demand for arbitration in which it sought compensatory damages and an "accounting/production" of records. In its counter-demand, which was amended on August 28, 1995, BCBS argued in part that Mednet breached the 1985 contract by its move to University Hospital Systems and by its attempt to steer HMO Health Ohio members to other University physician services through either false representations or misappropriation of patient information. BCBS also argued that Mednet breached the 1985 contract by its refusal to service Medicaid patients and in its unilateral determinations as to what services would or would not be covered. BCBS sought compensatory damages and an "accounting/production" of records so it could properly audit Mednet's performance under the 1985 contract.

On January 22, 1996, the case proceeded to arbitration before a panel of three arbitrators pursuant to the rules and procedures of the American Arbitration Association. Mednet claimed, among other things, that Section Four of the 1985 contract imposes a duty upon BCBS to employ reasonable efforts to market HMO Health Ohio. Section Four states in pertinent part:

"D. *Marketing.* The [prepaid health plan] shall be marketed as a line of business of BCBS. The marketing staff of the [BSBC] and other staff shall be responsible for the initial development of an annual (one year) and long range (five year) marketing plan for Cleveland East with input from the [Mednet] planning staff. Such plans shall be reviewed and approved by the Executive Committee before becoming effective."

Mednet argued that BCBS failed not only to market HMO Health Ohio but it actively attempted to steal enrollees from HMO Health Ohio in the Cleveland East region and convert them to its newly formed for-profit stock subsidiary. Specifically, Mednet argued that BCBS created a marketing strategy to market

Super Blue HMO to existing HMO Health Ohio accounts in the Cleveland East region. Mednet claimed that BCBS offered only Super Blue HMO to new groups and smaller renewing groups (ten to fifty eligibles). For larger renewing groups, HMO Health Ohio would be offered only if Super Blue HMO was simultaneously offered.

Evidence submitted to substantiate its claims included the Super Blue marketing plans from 1993 to 1996, as well as a correspondence by a BCBS actuary to the Ohio Department of Insurance that forecasted a twenty-percent reduction in HMO Health Ohio through 1995 and a cessation of business in the Cleveland East region by the end of 1997.

At the arbitration hearing, a substantial amount of testimony was directed toward the opinion of Mednet's expert witness, Mark Abernathy. Although his actual financial report was not included in the record on appeal, Abernathy testified in detail as to the report's contents and the methodologies he used to conclude that the damages Mednet suffered due to BCBS's failure to reasonably market HMO Health Ohio amounted to $18,368,535.

Abernathy testified that his calculations were based upon other capitation health care programs and a review of the current health care market. From his review, Abernathy made modest growth projections of HMO Health Ohio had BCBS continued to reasonably market HMO Health Ohio. From this figure, he calculated the revenue component by multiplying the projected number of members by a capitation rate, which he assumed would increase consistent with historic averages. From the projected revenue figure, Abernathy subtracted adjustments/expenses[3] and what the parties referred to as the mitigation of damages.[4]

BCBS argued in response, among other things, that contrary to Abernathy's report, the health care market was becoming increasingly competitive and the HMO Health Ohio's enrollment had reached a relatively stable plateau. BCBS argued that the turmoil within the Cleveland East region which resulted in HMO Health Ohio's membership loss was caused by Mednet's move out of Meridia Euclid Hospital and Mednet's own increased participation in other insurance products that were in competition with HMO Health Ohio. Additionally, BCBS argued that University's limited geographical coverage made HMO Health Ohio a

---

3. This figure included reductions in overhead expenses, co-payment revenues, hospital bonuses, deductible referrals, and a figure representing the projected number of members terminated from HMO Health Ohio.

4. This figure included cost savings such as the reduction in physician salaries and a recognition of other individuals served by Mednet not in HMO Health Ohio.

virtual dinosaur in the industry. BCBS claimed that due to Mednet's conduct, HMO Health Ohio incurred losses of $2,695,350.

In support of this assertion, BCBS provided evidence that other health care systems also lost a number of members during this period and that HMO Health Ohio had already lost approximately 10,648 members at the time of BCBS's implementation of Super Blue HMO.

As to Mednet's claims that BCBS injured Mednet by failing to offer HMO Health Ohio to groups comprising less than fifty individuals, BCBS argued that the business derived from those groups represented a minimal portion of the overall HMO Health Ohio business and that it carried a disproportionate administrative expense. BCBS argued further that its decision not to offer HMO Health Ohio to groups under fifty in number was implemented almost a year after HMO Health Ohio's enrollment began to decline and that out of the 15,000 members lost during that period, only three hundred forty-seven went to Super Blue HMO.

At the conclusion of the arbitration hearing, the parties were granted leave to submit briefs in support of their respective positions. On April 11, 1996, the arbitrators issued the following award:

"I. Breech of the 1985 Agreement. Arbitrators Greer and Stachler find in favor of University MedNet and award compensatory damages against Blue Cross & Blue Shield of Ohio in the amount of Fourteen Million Four Hundred Thousand ($14,400,000.00) Dollars. Arbitrator Hardy does not concur in this award.

"II. Economic Issues. [In adopting the format suggested by BCBS in its post-hearing brief, the arbitrators held the following:]

"A. Discounts For Purchased Services. University MedNet ('UMN') will provide Blue Cross & Blue Shield of Ohio ('BCBSO') the signed agreements and fee schedules which justify taking discounts, and BCBSO will charge outside providers in accordance with those contracts and fee schedules. BCBSO shall also reprocess any additional discounts on existing claims against outside providers and credit back to capitation payments such amounts to UMN.

"B. Improper Charges For Services Not Covered. Appendix II to the 1985 Agreement places upon UMN the responsibility for providing necessary medical supplies used in providing the services to non-hospitalized patients, except for drugs for chemotherapy, IV solutions and advanced home healthcare drug therapy programs. 'Drugs for chemotherapy' would include any drugs administered in conjunction with chemotherapy treatments. To the extent Series A and Series Q code charges relate to hospitalized patients or to drugs for chemotherapy, IV solutions and advanced home healthcare drug therapy programs, BCBSO is responsible for them.

"C.   Charges Related To Terminated Members.   The Panel understands that all claims prior to 1994 have been fully resolved.   Subsequent charge backs and credits shall be made by BCBSO in accordance with information available to it. BCBSO shall provide UMN with all data (in electronic form if it currently exists in that form) on which it relies in making its determinations of the amounts to be credited to UMN.

"D.   Possible Duplicate Claims For Services Performed By Outsider Providers.   The Panel understands that all claims prior to July 1, 1993 have been fully resolved.   Subsequent charge backs and credits shall be made by BCBSO in accordance with information available to it.   UMN shall make a good faith effort to identify from such information which claims are in fact possible duplicate claims and BCBSO shall thereafter manually audit such identified claims to determine if duplication in fact exists.   BCBSO shall provide UMN with all data (in electronic form if it currently exists in that form) on which it relies in making its determinations of the amounts to be credited to UMN.

"E.   Procedure Code Detail.   If BCBSO has readily available electronic data on this subject, such data shall be furnished to UMN. If not, BCBSO shall continue to provide the information it has been providing on this subject and UMN will have to seek from providers any additional information it needs or desires.

"F.   Undocumented Retroactive Terminations.   The Panel finds that there was no binding agreement of the parties to a sixty-day limitation on retroactive terminations.   If BCBSO has readily available electronic data on the subject of such terminations, such data should be furnished to UMN. If not, BCBSO should continue to provide the information it has been providing on this subject.

"G.   Rockside Road Subsidy.   UMN shall provide all backup documentation in support of the subsidy calculations presented in Exhibit UUUUU and BCBSO shall thereafter pay the amounts called for by the parties' agreement.

"H.   Independence Family Practice.   The Panel finds in favor of BCBSO on this issue.   The parties shall within the next sixty days resolve any economic issues not fully determined by the Panel's findings.   If the parties are unable to reach such a resolution, either of them, after the expiration of the sixty-day period may refer any unresolved issue back to the Panel or the parties may jointly request the Panel to appoint a special master with special expertise to resolve any such issue at the parties' joint expense.

"III.   Records and Audit.   Each party shall have full access to all records of either party relating to the operation and enrollees of HMO Health Ohio. If UMN elects to audit all or any such records for the period through December 31, 1987, it may do so at its sole costs and expense."

On April 30, 1996, Mednet filed in the Cuyahoga County of Court of Common Pleas an application to reduce the arbitration award to judgment. On May 8, 1996, BCBS filed an application to vacate the arbitration award pursuant to R.C. 2711.10. BCBS argued in support of its motion to vacate that:

1. the "bulk" of the award to Mednet was for "future damages," which damages constitute a double recovery, since the arbitrators did not terminate the contractual relationship of the parties;

2. the opinion and award was uncertain, ambiguous, and indefinite, since the arbitrators mandated that the parties are to resolve any economic issues not fully determined by the arbitrators;

3. the arbitrators exceeded their authority by retaining jurisdiction over the dispute;

4. one of the arbitrators did not participate in the damage phase of the deliberation process; and

5. the arbitrators failed to consider several issues submitted for review including BCBS's counterclaim.

On July 25, 1996, the trial court held the following:

"1. The arbitrators were not guilty of misbehavior by which the rights of any party have been prejudiced;

"2. The arbitrators did not exceed their powers, or so imperfectly execute them that a mutual, final and definite award upon the subject matter was not made;

"3. The award is not vague, ambiguous or indefinite."

Based upon these findings, the trial court denied BSBC's application to vacate and granted Mednet's application to reduce the arbitration award to judgment. It is from this decision that BCBS timely filed this appeal.

■ Initially, we note that "[i]t is the policy of the law to favor and encourage arbitration and every reasonable intendment will be indulged to give effect to such proceedings and to favor regularity and integrity of the arbitrator's acts." *Mahoning Cty. Bd. of Mental Retardation v. Mahoning Cty. TMR Edn. Assn.* (1986), 22 Ohio St.3d 80, 84, 22 OBR 95, 98, 488 N.E.2d 872, 875, citing *Campbell v. Automatic Die & Products Co.* (1954), 162 Ohio St. 321, 329, 55 O.O. 195, 198, 123 N.E.2d 401, 405.

■ "The only way to give effect to the purposes of the arbitration system of conflict resolution is to give lasting effect to the decisions rendered by an arbitrator whenever possible." *Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.* (1990), 52 Ohio St.3d 174, 176, 556 N.E.2d 1186, 1188.

Therefore, a reviewing court is precluded from reviewing the merits of the arbitration award, since doing so would interfere with and/or undermine the positive attributes of the arbitration process.

█ In accordance with this policy favoring private settlement of grievances, a trial court may vacate an arbitration award only as prescribed by R.C. 2711.10, which provides:

"In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if:

"(A) The award was procured by corruption, fraud, or undue means.

"(B) There was evident partiality or corruption on the part of the arbitrators, or any of them.

"(C) The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced.

"(D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

"If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may direct a rehearing by the arbitrators."

In its first assignment of error, appellant submits several reasons why the trial court committed prejudicial error when it denied its application to vacate the arbitration award pursuant to R.C. 2711.10. First, appellant argues that the award of future damages under the contract, without an order terminating the contract, leaves appellant liable for future capitation payments and results in a double recovery for appellee. Appellant argues that such double recovery is against public policy and constitutes manifest error.

█ Even if we agreed with appellant's characterization of the compensatory award as being, in part, "future damages for anticipatory breach," which we do not, R.C. 2711.10 does not authorize/empower reviewing courts to vacate an arbitration award based on an alleged public policy violation or "manifest error."

While we recognize that federal courts have, in some instances, expanded their scope of review of arbitration awards to include a public policy exception, see *United Paperworkers Internatl. Union v. Misco, Inc.* (1987), 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286; *S.D. Warren Co., Div. of Scott Paper Co. v. United Paperworkers' Internatl. Union, AFL–CIO, Local 1069* (C.A.1, 1988), 845 F.2d 3, certiorari denied (1988), 488 U.S. 992, 109 S.Ct. 555, 102 L.Ed.2d 582, the Ohio State Supreme Court has refused to expand state court review beyond the clear

terms of R.C. 2711.10. See *Lake Cty. Bd. of Mental Retardation & Dev. Disabilities v. Professional Assn. for the Teaching of the Mentally Retarded* (1994), 71 Ohio St.3d 15, 641 N.E.2d 180. Accordingly, we decline to recognize appellant's "public policy exception" in our review of the arbitration award.

■ As to appellant's assertion that by permitting appellee to receive a double recovery the award constitutes a "manifest error," we note that the cases cited by appellant use the term "manifest error" to describe what would otherwise be violations of R.C. 2711.10. See *Universal Underwriters Ins. Co. v. Shuff* (1981), 67 Ohio St.2d 172, 21 O.O.3d 108, 423 N.E.2d 417; *Warner v. CTL Eng., Inc.* (1983), 9 Ohio App.3d 52, 9 OBR 70, 458 N.E.2d 399; *Miami Twp. Bd. of Trustees v. Fraternal Order of Police Ohio Labor Council, Inc.* (Sept. 27, 1996), Montgomery App. No. 15930, unreported, 1996 WL 555043. As with appellant's assertions regarding a violation of "public policy" and consistent with the law of this state, this court will not expand the scope of our review of the arbitration award to include a separate and independent "manifest error" standard. Again, our review is strictly limited to those certain prescribed circumstances set forth in R.C. 2711.10. Upon consideration thereof, this court finds that what appellant characterizes as a "double recovery" under the arbitration award does not violate any of the provisions set forth in R.C. 2711.10.

Next, appellant alleges that the trial court erred in denying its application to vacate because the arbitration award is ambiguous, indefinite, and not final. Specifically, appellant argues that when the arbitrators failed to terminate the contractual relationship, they failed to resolve outstanding issues concerning the impact of the future damages award on the parties' ongoing business relationship and, therefore, the award is ambiguous, indefinite, and not final in violation of R.C. 2711.10(D).

Appellee responds that (1) appellant waived its right to appeal the arbitration panel's failure to terminate the parties' contractual relationship by its failure to raise the issue of termination of the contract at the arbitration, (2) the award was not based upon a finding of an "anticipatory breach" of the 1985 contract but, rather, on past and future harm resulting from the existing breach of the 1985 contract by appellant, and (3) appellee was not awarded a double recovery.

■■ This court has recognized that an arbitrator may not decide issues involving contractual rights of the parties that the parties have not submitted to the arbitrator for a decision. *Cleveland v. Assn. of Cleveland Fire Fighters* (1984), 20 Ohio App.3d 249, 20 OBR 311, 485 N.E.2d 792. Failure to raise an issue before the arbitrator prohibits the parties from raising the same issue at the appellate level. See, *e.g.*, *Natl. Wrecking Co. v. Internatl. Brotherhood of Teamsters, Local 731* (C.A.7, 1993), 990 F.2d 957, 960.

■ Upon consideration thereof, this court finds that none of the parties herein asked the arbitration panel to consider the issue of their future relationship under the 1985 contract and, therefore, appellant cannot now argue that the arbitrators' failure to terminate the contract renders the award ambiguous, indefinite, and not final in violation of R.C. 2711.10(D).[5]

Appellant further argues that the trial court erred in denying its application to vacate the arbitration award because the arbitrators exceeded their authority. Specifically, appellant asserts that the arbitrators either failed to resolve or resolved outside the scope of their authority (1) the economic issues submitted by appellee, (2) the issue of audit relief sought and obtained by appellee, (3) the amount owed for the Rockside Road subsidy, (4) appellant's counterclaim, and (5) issues for which it leaves further acts to be performed by the arbitrators. Appellant argues that the arbitrators, therefore, exceeded their authority and issued an award that is not final and conclusive and must be vacated in accordance with R.C. 2711.10(D).

Appellee responds that appellant waived such objection when, during the arbitration, it enthusiastically proposed the types of remedies adopted by the arbitrators. Appellee also argues that the arbitrators have broad discretion to shape remedies and that the arbitrators in this case exercised said discretion appropriately.

■ Upon consideration thereof, we find appellant's arguments to be unpersuasive. Initially we note that arbitrators possess broad discretion when fashioning a remedy for a contractual violation. *Queen City Lodge No. 69, Fraternal Order of Police, Hamilton Cty., Ohio, Inc. v. Cincinnati* (1992) 63 Ohio St.3d 403, 588 N.E.2d 802. Further, it is well established that the agreement to submit a matter to arbitration describes the issues and defines the parameters of the arbitration tribunal's power with respect to the issuance of an award. See *Lockhart v. Am. Res. Ins. Co.* (1981), 2 Ohio App.3d 99, 2 OBR 112, 440 N.E.2d 1210.

In this case, the parties' 1985 contract provided that the American Arbitration Association rules would govern the arbitration proceeding. American Arbitration Association Commercial Mediation Rules and Procedures, Rule 43, states in part: "The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including but not limited to, specific performance of a contract." Such provision has been found to give broad latitude and discretion to arbitrators when fashioning a

---

5. This would include appellant's argument concerning a setoff and/or abatement raised in a later portion of its appellate brief.

remedy.  See *Island Creek Coal Sales Co. v. Gainesville* (C.A.6, 1984), 729 F.2d 1046.

■  Since there is no restrictive language in the parties' 1985 contract preventing the arbitrators from issuing an award with instructions for further discovery and/or disclosure of information necessary to effectuate the award as a whole, the arbitrators may fashion an award incorporating such instructions so long as it does not violate R.C. 2711.10.

■  From a review of the parties' 1985 contract and the arbitration award, this court finds that there exists a rational nexus between the 1985 contract and the arbitration award.  The parties themselves submitted a number of specific economic issues stemming from their obligations under the 1985 contract for the arbitrators' determination.  It is clear from the record that the arbitrators interpreted the pertinent portions of the 1985 contract and applied them to the evidence presented at the arbitration hearing·in addressing these issues.  The fact that the award instructs the parties to provide each other with additional information so that such award can be carried out does not render the award indefinite.  Again, the economic issues submitted by the parties were addressed in a format proposed by the parties.  On each economic issue, including the request for an audit and the Rockside Road subsidy, a decision was rendered by the arbitrators.  The type of award that was made was necessary due to the complexity of the issues and the parties' failure to provide sufficient information to the arbitrators.  Simply put, the arbitrators could not be expected to provide specific monetary figures when the information necessary to determine such figure was not provided to them.

■  Accordingly, this court cannot find that, by retaining jurisdiction in the event the parties are unable to implement the award, the arbitrators impermissibly exceeded their powers and/or authority.  As to appellant's counterclaim, it is clear by the nature of the dispute and the findings of the arbitrators that the award in favor of appellee constitutes an implicit finding against appellant on its counterclaim.  See, *e.g.*, *Longhauser v. Beatty, Inc.* (1988), 55 Ohio App.3d 215, 563 N.E.2d 355; *Curry v. Century 21 Kittyhawk Realty, Inc.* (May 15, 1991), Greene App. No. 90–CA–95, unreported, 1991 WL 82971.

Finally, appellant argues that one of the arbitrators failed to participate fully in all phases of the arbitration proceeding and, therefore, deprived appellant of its procedural due process in violation of R.C. 2711.10(C) and (D).  Appellant argues that it was discovered in a telephone conversation between Arbitrator Hardy and appellant's counsel that Hardy was not present during the damage phase of the deliberations.

■ "It is the policy of the law to favor and encourage arbitration and every reasonable intendment will be indulged to give effect to such proceedings and to favor the regularity and integrity of the arbitrator's acts." *E. Cleveland v. E. Cleveland Firefighters Local 500, I.A.F.F.* (1994), 70 Ohio St.3d 125, 128–129, 637 N.E.2d 878, 881, citing *Campbell v. Automatic Die & Products Co.* (1954), 162 Ohio St. 321, 329, 55 O.O. 195, 198, 123 N.E.2d 401, 405. Accordingly, it is reasonable to presume that when an arbitrator signs an arbitration award, he or she participated in the deliberations thereon.

■ In this case, there is no dispute that all three arbitrators signed the arbitration opinion and award in accordance with R.C. 2711.08. The fact that Arbitrator Hardy, who was selected by appellant, did not concur with the award does not in and by itself mean that he did not participate in the deliberations. Upon a review of the entire record before the trial court, this court finds that appellant did not present evidence to substantiate its allegations that Arbitrator Hardy did not participate in the deliberation process. Appellant's unsworn allegations as to a telephone conversation do not provide a sufficient basis for this court to find that one of the arbitrators failed to participate in the deliberation process of the arbitration panel.

In accordance with the foregoing, this court cannot find that the trial court erred in denying appellant's application to vacate pursuant to R.C. 2711.10, and appellant's first assignment of error is found not well taken.

In its second assignment of error, appellant argues that the trial court committed reversible error when it failed to rule on its request to depose one of the arbitrators concerning his participation in the deliberation process. In the alternative, appellant argues that the trial court erred in failing to permit it to proffer evidence into the record in support of its motion to vacate.

Appellee argues in response that Ohio law bars a party from deposing members of an arbitration panel in order to learn how a damage award was calculated. Appellee cites *Corrigan v. Rockefeller* (1902), 67 Ohio St. 354, 66 N.E. 95, in support of its proposition that the testimony of arbitrators is not competent evidence upon which to impeach an award. See, also, *Napoleon Steel Contractors v. Monarch Constr. Co.* (1982), 3 Ohio App.3d 410, 3 OBR 476, 445 N.E.2d 743.

■ The granting of a request to depose an arbitrator following the issuance of an arbitration award is a matter within the discretion of the trial court. See *Corrigan, supra; State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. Such relief should be allowed only in very limited circumstances, such as an attempt to establish which claims had been presented for arbitration and which had been ruled upon, *Napoleon, supra,* or to demonstrate fraud and/or corruption. *Warner, supra.* "However, such testimony is not

discoverable or admissible to impeach the arbitrator's award." *Napoleon, supra,* at 412, 3 OBR at 479, 445 N.E.2d at 746.

Initially, we note when a court fails to rule on a motion, it will be presumed that the court overruled and/or denied said motion. *Solon v. Solon Baptist Temple, Inc.* (1982), 8 Ohio App.3d 347, 8 OBR 458, 457 N.E.2d 858. We therefore find preliminarily that the trial court's failure to rule on appellant's request to depose one of the arbitrators constitutes a denial of that request.

In this case, the request to depose the arbitrator was made based upon the unsworn statements of one of appellant's attorneys as to communications made by the arbitrator in a telephone conversation. Appellant requested the opportunity to depose one of the arbitrators in an effort to demonstrate that he did not participate in the deliberation process. Such a request falls within the ambit of attempting to impeach the arbitration award.

Upon consideration thereof, this court finds that the trial court did not abuse its discretion when it denied appellant's request to depose the arbitrator and failed to permit appellant to proffer the unsworn hearsay statements into the record. Accordingly, appellant's second assignment of error is found not well taken. On consideration whereof, this court finds that substantial justice has been done the party complaining, and the judgment of the Cuyahoga County Court of Common Pleas is hereby affirmed. Court costs of these proceedings are assessed to appellant.

*Judgment affirmed.*

VICTOR, J., concurs.

HOLMES, P.J., concurs in judgment only.

ROBERT E. HOLMES, P.J., retired, of the Supreme Court of Ohio, sitting by assignment.

CHARLES ABOOD, J., retired, of the Sixth Appellate District, sitting by assignment.

WILLIAM HENRY VICTOR, J., retired, of the Ninth Appellate District, sitting by assignment.