OPINION JUDGMENT ENTRY
{¶ 1} Appellant Sheronne Knight appeals her conviction and sentence in the Fairfield County Court of Common Pleas on three counts of conspiracy to trafficking in drugs. Appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
{¶ 2} On May 21, 2002, a confidential informant of the Fairfield-Hocking Major Crimes Unit arranged to meet Charles Millender at the McDonald's restaurant located in Carroll, Ohio for the purchase of cocaine. Per their arrangement, the informant would page Millender and coordinate a meeting for the purchase of cocaine. According to the informant, on May 21, 2002, appellant drove a vehicle with Millender in the passenger seat and a very young boy in the back to the McDonald's restaurant. The informant drove her car next to the passenger side of appellant's vehicle and handed Millender cash through the window in exchange for the cocaine. The transaction was recorded by the police department.
{¶ 3} On May 31, 2002, the informant arranged a second drug purchase. Again, appellant drove Millender to the McDonald's with a baby in the back seat. The drug transaction was once again recorded.
{¶ 4} On July 25, 2002, a third drug transaction was recorded at a Cracker-Barrel Restaurant in Pickerington, Ohio. On this occasion, the informant parked in a spot where Millender would have to exit his vehicle and walk over to her car. Again, appellant drove Millender to the scene, and the transaction was recorded.
{¶ 5} Appellant told Detective Lee Hawks of the Fairfield-Hocking Major Crimes Unit she drove Millender to the scene and was paid $100.00 for doing so. Detective Hawks then asked appellant whether there would be drugs found at her residence and appellant indicated she believed there would be because she had observed Millender weighing some crack cocaine on some scales at her house just before they left, as well as, counting a large sum of money. Appellant told Detective Hawk there would be a good chance drugs would be found in the closet.
{¶ 6} Appellant told Detective Dustin Mowery of the Logan Police Department Millender spends many nights with her, pays the rent, and she does not pay anything. Appellant began dating Millender prior to finding out Millender was selling crack cocaine. Millender bought appellant clothing and presents for her son, and paid cash for approximately ten cars as presents for appellant. Appellant told the detectives she did not go with Millender to buy the drugs, and stated "I just take him to drive him to . . . I guess to meet the little people like that lady."
{¶ 7} After appellant's arrest, appellant consented to a search of her residence in Franklin County, Ohio. In the course of the search, a quantity of drugs and money were recovered. Appellant objected to the admissibility of the evidence at trial. The trial court overruled appellant's objection, allowing evidence and testimony concerning the drugs and money. On January 8, 2003, a jury convicted appellant of three counts of complicity to trafficking in drugs. On February 7, 2003, the trial court sentenced appellant to ten years in prison, the minimum sentence.
{¶ 8} It is from this conviction and sentence, appellant now appeals raising the following assignments of error:
{¶ 9} "I. The trial court committed harmful error in allowing irrelvant [sic] and otherwise inadmissible evidence of other bad acts to reach the jury.
{¶ 10} "II. The conviction of the defendant-appellant is based upon improper inference stacking and cannot stand"
 I, and II
{¶ 11} Appellant's assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
{¶ 12} Appellant maintains the trial court committed harmful error in allowing irrelevant and otherwise inadmissible evidence of other bad acts to reach the jury. Appellant argues the bad acts evidence should have been excluded.
{¶ 13} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage
(1987), 31 Ohio St.3d 173, 510 N.E.2d 343. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
{¶ 14} Evid.R. 404(B) states:
{¶ 15} "(B) Other crimes, wrongs or acts
{¶ 16} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
{¶ 17} Upon admission of the evidence recovered from appellant's residence, the trial court instructed the jury as follows:
{¶ 18} "* * * These acts or wrongs that have been suggested here are not admitted to show proof of character of a person in order to show that the Defendant in this case acted in conformity therewith. It is not to prove that her character — that she was therefore involved in other things."
{¶ 19} "It may be admissible and is admissible for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
{¶ 20} Tr. at 194-195.
{¶ 21} At trial, Detective Hawks testified:
{¶ 22} "Q. What else did she tell you?
{¶ 23} "A. Our concern was that there was the potential for more drugs to be found at her residence at 447 Ashburton in Columbus. And I had asked her if there was any more controlled substances at the house. She felt that there would be because she had observed Charles weighing up some crack cocaine on some scales at her house prior to leaving, as well as counting a large sum of money.
{¶ 24} "Q. Did you ask her where the drugs would be or where there might be money at that residence?
{¶ 25} "A. Yes. She indicated that there would be a good chance it would be in the closet, that that was a common hiding place for him." Tr. at 289-290.
{¶ 26} In her July 26, 2002 interview with Detective Mowery, appellant stated:
{¶ 27} "DETECTIVE MOWERY: Okay. When — when did you know or when did you find out or have you always known that Charles has been selling crack?
{¶ 28} "SHERONNE KNIGHT: I ain't — huh-uh. I didn't find that out until like after Christmas, `cause before when we first had met, he was showing me that he got BWC checks for Workers' Comp for hurting his back or whatever. And I'm like — `cause before when I first met him, he didn't have all that nice stuff like the car. He just had like a raggedy Cadillac or whatever. So I'm like, okay, he don't work. He just really gets a check. Then after I got to know —
{¶ 29} "DETECTIVE HAWKS: Does he still get BWC checks?
{¶ 30} "SHERONNE KNIGHT: Uh-huh. And then after I got to know him, I'd say right after Christmas, me and him started getting closer and that's when he started telling me more.
{¶ 31} "I'm like, `What do you do? How do you get your money besides your check?'
{¶ 32} "And he's like, `I sell dope,' or whatever. And that's when I start — I seen, you know, all the clothes he would buy me and all the stuff he would buy my son. And then he bought me all my cars. So that's how I knew he was selling."
{¶ 33} Tr. at 320-321.
{¶ 34} The interview continued:
{¶ 35} "DETECTIVE MOWERY: So how much — how much is he making a week? How much — how much coke or crack is he buying a week and how much is he making a week?
{¶ 36} "SHERONNE KNIGHT: I don't go with him when he buys it.
{¶ 37} "DETECTIVE MOWERY: Okay. He never took you with him?
{¶ 38} "SHERONNE KNIGHT: I just — I just take him to drive him to — I guess to meet the little people like that lady. But like as far as him going to actually buy it off of whoever he buys if from, I won't go with him.
{¶ 39} "DETECTIVE MOWERY: How many — so who would be — who takes him over there then?
{¶ 40} "SHERONNE KNIGHT: He goes with a friend, his friends who's got licenses and stuff. They'll drive him.
{¶ 41} "DETECTIVE MOWERY: They'll drive him?
{¶ 42} "SHERONNE KNIGHT: `Cause he ain't got no license.
{¶ 43} "DETECTIVE MOWERY: Yeah, right.
{¶ 44} "SHERONNE KNIGHT: And he won't drive by himself, but his friends will drive him.
{¶ 45} "DETECTIVE MOWERY: Okay. I mean, you said something about you going and driving him to these other little people —
{¶ 46} "SHERONNE KNIGHT: Yeah, like the lady like yesterday.
{¶ 47} "DETECTIVE MOWERY: Right.
{¶ 48} "SHERONNE KNIGHT: Like I'll take him something like that. And basically, I've been taking him just to that lady."
* * *
{¶ 49} "DETECTIVE MOWERY: How often does he go and meet people?
{¶ 50} "SHERONNE KNIGHT: A whole lot.
{¶ 51} "DETECTIVE MOWERY: I mean, what's a whole lot? Because a whole lot to you is going to be different to me. I mean, ten times a day?
{¶ 52} "SHERONNE KNIGHT: Probably more than that.
{¶ 53} "DETECTIVE MOWERY: 10, 20, times a day?
{¶ 54} "SHERONNE KNIGHT: Yeah, all night long. All day, all night long. Just 24 hours. Just on the go, put it like that."
{¶ 55} Tr. at 325-326, 334.
{¶ 56} Appellant stated in her interview with Detective Hawks:
{¶ 57} "DETECTIVE HAWKS: Yesterday you were telling me that Charles paid you $100 or was going to pay you $100 for driving him down.
{¶ 58} "SHERONNE KNIGHT: That was in my purse. That money, that's what he gave me.
{¶ 59} "DETECTIVE HAWKS: The other times that you drove down to meet this girl, did he pay you those times too?
{¶ 60} "SHERONNE KNIGHT. Uh-huh.
{¶ 61} "DETECTIVE HAWKS: Was it usually always $100 or more?
{¶ 62} "SHERONNE KNIGHT: Probably more. The most he gave me for going to meet that girl, he gave me 250 and that's when I was — I forget when it was. But I'm like, I'm going to and I'm going to buy me an outfit and buy my son stuff or whatever."
{¶ 63} Tr. at 345.
{¶ 64} Review of the above indicates appellant admitted to Detective Hawks there would be drugs found in her apartment. The evidence demonstrates appellant's knowledge of Millender's engagement in illegal activity and the absence of mistake. The trial court rendered appropriate cautionary instructions upon admitting the evidence. Accordingly, we find the trial court did not abuse its discretion in admitting the evidence recovered from appellant's residence.
{¶ 65} Appellant further maintains her conviction is based upon improper inference stacking and cannot stand Specifically, appellant alleges her conviction is premised upon an inference she was aware drugs were in her home and knowingly allowed them to be kept in her residence, based upon the recovery of drugs from her home. Based upon this inference, she argues, the jury inferred she was aware of Millender's illegal activities and knowingly assisted him in the same. She maintains only through stacking these inferences, initially drawn from improperly admitted evidence, can the conviction be justified on the record. We disagree.
{¶ 66} As set forth above, appellant admitted to Detective Hawks there would be drugs found in her residence. She informed both Detective Hawks and Detective Mowery she knew Millender was engaged in the illegal trafficking of drugs, and he paid her to drive him to transact the drug sales. We disagree with appellant's argument her conviction is based upon the stacking of inferences. Rather, we find appellant's conviction based appropriately upon direct and circumstantial evidence, including her own statements and admissions.
{¶ 67} Accordingly, appellant's assignments of error are overruled. The judgment of the Fairfield County Court of Common Pleas is affirmed.
Judgment affirmed.
Wise and Boggins, JJ. concur.
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Fairfield County Court of Common Pleas is affirmed. Costs assessed to appellant.