DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Sandusky County Court of Common Pleas which denied pro se plaintiff-appellant, Leonard Bohanan's, motion for a new trial. Appellant filed that motion after the trial court entered a judgment on a jury verdict in favor of defendant-appellee, Daimler Chrysler Corporation, on appellant's claims arising out of his purchase of a 2001 Dodge Caravan. For the following reasons we affirm the judgment of the trial court.
 {¶ 2} On September 26, 2001, appellant filed a complaint in the court below alleging violations of Ohio's "lemon law," R.C. 1345.71 et seq., and the Ohio Consumer Sales Practices Act, R.C. 1345.01 et seq. Appellant alleged that he had purchased a 2001 Dodge Caravan from Baumann Chrysler-Jeep-Dodge in Fremont, Ohio, on or about July 18, 2001, and that when he drove the vehicle home he noticed that the steering wheel was off center and that the van pulled to the right. Appellant further alleged that he took the vehicle back to the dealership on July 19, 2001, and at least two times thereafter, complaining about the van's pulling to the right. The dealership, however, was never able to adequately correct the problem. In addition, appellant claimed that the vehicle contained other defects including a bad paint job, a rear hatch that was out of alignment, and an improperly functioning dome light. Although appellant admitted that the paint job and dome light problems had been fixed, he asserted that the steering problem and rear hatch problem remained.
 {¶ 3} The case proceeded to a jury trial on January 15, 2003, at which appellant represented himself. Appellant testified that when he first drove his new van home from the dealership he noticed that it would veer to the right. The next day he called Christopher Beck, the Baumann salesman who sold him the car, to complain about the problem. He then returned the van to Baumann and left it there. Several hours later, Beck called him and said that the van had been repaired and that appellant could pick it up. Beck reported that the problem was a low tire. While driving the van back to his office, however, appellant observed the same problem. On July 24, 2001, appellant again called Beck to complain and took the van back to the dealership. Later that day, Beck called appellant and told him that the van had been repaired and that again the problem was a low tire. In appellant's opinion, however, the problem persisted. After complaining again, he made arrangements with Baumann's service manager, Steven Peto, to bring in the van for a front end alignment as well as other work. Appellant testified, however, that when that work was completed, the van still pulled to the right. He then complained to the Chrysler complaint department, which initially routed his complaint back to Steven Peto. Subsequently, in December 2001, Chrysler sent a factory representative to evaluate the van. At that time, however, appellant had already filed suit. Appellant also testified about the rear hatch of the van, complained that it was not even and said that he was not satisfied with the adjustment made to the hatch. During the time that Baumann was attempting to fix the alleged alignment and hatch problems, appellant complained about other problems such as a "bad paint job" and a dome light. Those problems, however, were fixed to appellant's satisfaction. Appellant further testified that on December 10, 2001, he took the van to Tom's Tire and Auto, who evaluated the vehicle and told appellant that it was out of alignment. Appellant, however, refused to have Tom's repair the van. With regard to the safety of the van, appellant testified that in his opinion it was unsafe to drive under certain circumstances, although he never defined those circumstances, admitted that his wife drives the van and admitted driving the van to Cincinnati.
 {¶ 4} Marcus Heilman also testified at the trial below. Heilman stated that in December 2001 he was employed by Tom's Tire and Auto when he evaluated appellant's van. Heilman testified that upon road testing the vehicle, the steering was crooked and the van pulled to the right. When he put the van on an alignment machine, the machine indicated that the left rear of the vehicle was out of alignment. He then stated that a new van should not have had such an alignment problem and that it would cost $200 to fix. On cross-examination, however, Heilman stated that under normal conditions, he did not consider the van to be dangerous. Heilman was also asked about the alignment specifications listed on the Baumann printout from the alignment done on August 22, 2001. Although the alignment specifications on that printout were for the 1996 to 2000 Dodge Caravan minivans, Heilman stated that if the 2001 specifications were also covered by the numbers listed for the 1996 to 2000 specifications, the alignment printout showed that there was no alignment problem with the van on August 22, 2001.
 {¶ 5} Appellant next called Christopher Beck, the Baumann salesman, to testify. Beck stated that several days after appellant took delivery of the van, he called to complain that it was pulling to the right. Beck told appellant to bring the van in and he would have it checked out. Appellant then brought the van in on July 22, 2001, Beck directed it to Steve Peto, the service manager and several hours later, Beck called appellant to tell him the van was ready. Beck did not recall what the diagnosis was. Although he did not recall the date, Beck stated that appellant then called him a second time complaining that the van was pulling to the right. He then drove the van himself and did not experience the van pulling to the right as appellant had described. At one time he even drove the van across town to deliver it to appellant and did not experience a pulling problem. Nevertheless, Beck directed appellant's complaints to Steve Peto, the service manager. He himself did not attempt to repair the vehicle.
 {¶ 6} Scotty Barnett was the next witness to testify. Barnett worked as a technician for Baumann during the time appellant complained about problems with his van. Barnett recalled working on the van around August 1, 2001. He stated that he fixed a dome light problem and tried to adjust the rear hatch to make it level. In his opinion, the rear hatch was not a major problem and defined it as cosmetic. Barnett was shown a copy of a work order from Baumann covering appellant's van. The work order lists complaints made by appellant and covers work performed on appellant's van from August 2, 2001, to September 25, 2001. The order only includes one listing for a complaint that the vehicle was pulling to the right. The final listing, however, does state that "vehicle was released to customer then brought back for additional repairs and added on as per cair [sic] file sent vehicle was brought back 9/17/01 for Chrysler district manager to inspect. Released vehicle to customer." Regarding appellant's rear hatch complaint, the work order states: "Customer states that the rear hatch is out of alignment one side is flush to the quarter and the other is in-advise adjustment[;] adjusted rear hatch. Customer to return to have body shop complete the adjustment. Appointment never set." Regarding the rear hatch complaint, Barnett testified that although the hatch was slightly out of alignment, the problem was not observable to the naked eye and that he only found it by running his hand along the seam.
 {¶ 7} Next, Steve Peto, Jr., the service manager for Baumann testified at the trial below. Peto stated that as the service manager it is his job to make sure that vehicles are repaired properly. He testified that appellant originally came in complaining that the van pulled to the right and subsequently added other complaints. Later Daimler Chrysler made a complaint regarding the van on appellant's behalf and Chrysler sent a district manager to Baumann to address appellant's concerns. Regarding the work order testified to by Barnett, Peto stated that it reveals a total of four actual repairs made to appellant's van: one for the rear hatch, one for the dome light, one for paint repairs and one for the alignment. The front end alignment was completed on August 22, 2001. Peto testified that that front end alignment was the first and only repair attempt made to correct the alleged alignment problem. In making that repair attempt, Peto stated that he centered the steering wheel. He further stated that any other repair attempts would be documented by a repair order and that there were no other repair orders covering appellant's van. Peto did further state, however, that a repair attempt may have been made when the paint problems on the van were being repaired. Subsequently, on December 11, 2001, the van was again placed on the alignment machine when a Chrysler district inspector, Jim Carbury, came to Baumann to look into appellant's complaints. Peto testified that at that time, he went on a test drive with appellant and Carbury and detected no pulling problem in the van. Regarding appellant's complaint that the rear hatch of the van was not flush with the body of the vehicle, Peto stated that he offered to set up an appointment for the body shop to look at the hatch, but appellant was not interested.
 {¶ 8} Appellant next called William Wensinger, a technician for Baumann, to testify. Wensinger stated that he first worked on the van on August 22, 2001. At that time, he put the van on the alignment machine and obtained a readout which indicated that the van's alignment was within the specifications for a Dodge Caravan from the model years 1996 to 2000. He further stated, however, that the specifications for the years 1996 to 2000 only varied slightly from the specifications for the 2001 model year and that the van was also within the limits for the 2001 specifications. Although the van's alignment was within the specifications, he attempted to adjust or "tweak" the steering wheel in an attempt to get the van's alignment closer to the midline of the specifications. He again placed the van on the alignment machine on December 11, 2001. At that time, it was measured against the specifications for a 2001 Dodge Caravan. Again, the van was properly aligned. At that time he was not asked to make any repair attempts on the van.
 {¶ 9} The final witness to testify was Jim Carbury, a technical advisor for Daimler Chrysler. Carbury was the only witness called by appellee. Carbury testified that he was assigned to investigate appellant's complaint that the van pulled to the right, as well as several other of appellant's concerns. After road testing and inspecting the van, Carbury wrote a report which concluded that the van did not have an alignment or pulling problem. The van did, however, "drift to the right within 200 to 300 feet without holding [the] steering wheel while driving in the right hand lane." With regard to appellant's rear hatch complaint, Carbury's report states that the hatch is not off center, although it was "underflush" to the quarter panels. Carbury, however, did not find any evidence that the van had been rear ended. Upon his inspection, Carbury testified that he was not concerned about the vehicle from a safety standpoint.
 {¶ 10} At the conclusion of the trial, the jury returned defense verdicts on appellant's claims for violations of Ohio's lemon law statute and the Ohio Consumer Sales Practices Act. Subsequently, appellant filed a motion for a new trial on the grounds of irregularity in the proceedings, that the judgment was contrary to law, and that the judgment was not sustained by the weight of the evidence. Appellant did not elaborate on these grounds with a supporting memorandum. The trial court denied the motion. It is from that judgment and the underlying judgment for appellee that appellant now appeals.
 {¶ 11} Appellant's brief raises eight assignments of error which all challenge evidentiary rulings made by the trial court. Because the form of appellant's assignments of error does not strictly comply with the Appellate Rules, we have only quoted that portion of them that expressly assigns an error:
 {¶ 12} "1. The court errored [sic] by not allowing the Plaintiff to impeach his witness, according to EvR [sic] 607.
 {¶ 13} "2. The court errored [sic] when it refused to allow Plaintiff to refresh his memory on a question he could not remember.
 {¶ 14} "3. The court errored [sic] by not allowing the witness to answer Plaintiff's question, according to Title 13, Volume Two, 1345.72(A) (B), which Plaintiff has listed in his Table of Authorities.
 {¶ 15} "4. The court errored [sic] for [sic] not allowing the witness to answer Plaintiff's question. The Ohio Constitution and The Constitution of the United States, gives the Plaintiff the right to an unbiased trial.
 {¶ 16} "5. The court continues to interfere with the witness answering Plaintiff's question.
 {¶ 17} "6. The court errored [sic] in overruling Plaintiff's objection, then agreed with the Plaintiff that he was right, that the Defendant's attorney should not be speculating.
 {¶ 18} "7. The court errored when the Defendant's attorney made an objection, but did not know what he was objecting to. The court told him what to object to, so he objected, and the court sustained it's own objection.
 {¶ 19} "8. The court errored [sic] by not allowing Plaintiff to enter the dates these events occured [sic] as evidence."
 {¶ 20} We first note that the admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180. In order to find an abuse of discretion we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. Moreover, where a party fails to object to an alleged evidentiary ruling at the trial below, he has waived any error in the ruling and may not raise the issue on appeal. StoresRealty Co. v. Cleveland (1975), 41 Ohio St.2d 41, 43.
 {¶ 21} Upon a review of the transcript, we find that appellant failed to object to the evidentiary rulings which he challenges under his second and eighth assignments of error. Accordingly, those assignments of error are not well-taken.
 {¶ 22} In his first assignment of error, appellant asserts that the trial court erred in not allowing him to impeach his own witness. Appellant refers to his redirect examination of Scotty Barnett. Appellant was questioning Barnett as to the repairs he remembered making to the van. Barnett recalled running his hand along the seam of the rear hatch to see if there was a difference in the level between the hatch and the body of the van. He did not, however, recall whether he personally drove the van. Appellant then began to cross-examine Barnett and treat him as a hostile witness. Appellee objected and the court sustained the objection, instructing appellant that he could not at that time begin to impeach his own witness.
 {¶ 23} Evid. R. 607(A) reads in relevant part: "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Appellant never argued to the court that he was surprised or damaged by Barnett's statement. Moreover, we fail to see how Barnett's statement could damage appellant's case. Barnett simply testified that he remembered some of the work that he did on appellant's van but did not remember all of the work that he did on it. Accordingly, we cannot say that the lower court erred in refusing to allow appellant to treat Barnett as a hostile witness and the first assignment of error is not welltaken.
 {¶ 24} In his third assignment of error, appellant asserts that the lower court erred in not allowing Steve Peto to answer appellant's question regarding Daimler Chrysler's procedures. As is clear from the record, however, Peto was not an employee, representative or agent of Chrysler and had no knowledge of Chrysler's internal procedures. Accordingly, the trial court did not err in refusing to allow Peto to answer appellant's question and the third assignment of error is not well-taken.
 {¶ 25} In his fourth assignment of error, appellant asserts that the trial court erred in refusing to allow Steve Peto to answer a question posed by appellant. The point in the transcript which appellant references demonstrates that appellant asked Peto, "Do you know whether Charles Owen had the abilities [sic] to replace my van?" Appellee objected and the court responded, "If you know." Peto then answered, "No, I don't know." Appellant then asked again, "Do you know whether Charles Owen had the ability to replace my van?" Peto nodded, indicating no and appellee objected. The court sustained the objection. Clearly, the question had already been asked and answered and the court did not abuse its discretion in sustaining the objection. The fourth assignment of error is not well-taken.
 {¶ 26} In his fifth assignment of error, appellant asserts that the trial court interfered with his questioning of Steve Peto. The pages of the transcript which appellant references, however, demonstrate that the court was simply trying to clarify appellant's question and did not limit or interfere in that questioning in an inappropriate way:
 {¶ 27} "THE COURT: Didn't he already testify? Didn't he say an answer to the question? Did you answer his question?
 {¶ 28} "THE WITNESS: I'm not sure.
 {¶ 29} "THE COURT: Who did you say told you that it moved to the right?
 {¶ 30} "THE WITNESS: Mr. Bohanan.
 {¶ 31} "THE COURT: Okay. All right.
 {¶ 32} "MR. BOHANAN: But what I want to be clear for the record, it was not Chris Beck that told him, it was me, it was myself.
 {¶ 33} "THE COURT: Are you testifying? I'm asking Mr. Bohanan if he is testifying. Are you testifying at this point in time?
 {¶ 34} "MR. BOHANAN: No, I'm asking him was he aware of that.
 {¶ 35} "THE COURT: Aware of what?
 {¶ 36} "MR. BOHANAN: That I was the only one that complained to him about the problem with my vehicle pulling to the right.
 {¶ 37} "THE COURT: That's your question?
 {¶ 38} "MR. BOHANAN: That's my question.
 {¶ 39} "THE COURT: Do you have an answer to that?
 {¶ 40} "THE WITNESS: I would say no at this point."
 {¶ 41} As is clear from the quoted passage, the court was simply trying to clarify appellant's question. Moreover, appellant was able to ask his question and the witness answered it. The fifth assignment of error is not well-taken.
 {¶ 42} In his sixth assignment of error, appellant essentially challenges the trial court's order sustaining his objection. We fail to see how appellant was prejudiced by this order or how the trial court abused its discretion in its ruling. The sixth assignment of error is not well-taken.
 {¶ 43} Finally, appellant's seventh assignment of error challenges the trial court's order sustaining appellee's objection during his redirect examination of William Wensinger:
 {¶ 44} "Q. [By Appellant]: That's not my question. My question was: If a vehicle dog track [sic], you say it could go down the road sideways on an icy road, wouldn't that be dangerous?
 {¶ 45} "A. Possible.
 {¶ 46} "MR. GRAY: I object.
 {¶ 47} "THE COURT: What's the objection?
 {¶ 48} "MR. GRAY: I'm going to object. First of all, he's leading the witness. And, second, I'm not sure —
 {¶ 49} "THE COURT: He's asking him to speculate.
 {¶ 50} "MR. GRAY: He's asking him to speculate.
 {¶ 51} "THE COURT: Sustained. It's sustained. You are asking him to speculate as to whether or not he gave a situation where it wouldn't be, you gave a situation where it was, so you're asking him at some point to speculate when it switches from being dangerous. Be a little more specific in your question please, Mr. Bohanan."
 {¶ 52} Appellant then continued his questioning of Wensinger as follows:
 {¶ 53} "Q. If a vehicle dog track [sic], would it be dangerous to drive?
 {¶ 54} "A. No.
 {¶ 55} "Q. If a vehicle dog track [sic] on icy road, would it be dangerous to drive?
 {¶ 56} "A. I suppose it's possible, yes.
 {¶ 57} "Q. Possibility?
 {¶ 58} "A. Possible."
 {¶ 59} Accordingly, appellant was able to question Wensinger about whether dog tracking on an icy road could be dangerous. The court's ruling simply forced appellant to ask the question in a proper fashion. We fail to see how appellant was prejudiced by this ruling and the seventh assignment of error is not well-taken.
 {¶ 60} Finding no error in the trial court's evidentiary rulings, we find no error in the trial court's denial of appellant's motion for a new trial.
 {¶ 61} On consideration whereof, the court finds that substantial justice has been done the party complaining and the judgment of the Sandusky County Court of Common Pleas is affirmed. Pursuant to App. R. 24, appellant is ordered to pay the court costs of this appeal.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Knepper, J., Concur.