OPINION *Page 2 
{¶ 1} Appellant Randall A. Rebuelta appeals his conviction for murder in the Stark County Court of Common Pleas. The appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.
 {¶ 2} On the evening of December 5, 2005, Kortez "Hub" Hubbard, age seventeen, was spending some time with his best friend, Delreno Miller, in the vicinity of the Cherry Street Market, a convenience store on the southeast side of Canton. At about 6:30 PM, Appellant Rebuelta, who went by the street names of "Logic" and "Knowledge," walked into the store. Inside, he had a brief conversation with Lorenzo Burton about a past disagreement over ownership of a dog. Lorenzo's cousin, Juwan Burton, who had walked to the Cherry Street Market with Hubbard that day, also entered the store shortly after appellant arrived. The store's cashier, Bernita Singletary, told the Burton cousins to leave appellant alone.
 {¶ 3} Appellant soon left the store, heading toward Alan Page Drive. Lorenzo and Juwan Burton also left. At about this point, appellant headed back to the store's parking lot and got into a physical altercation with Hubbard. According to several witnesses, appellant pulled a revolver out of his pants and fired in Hubbard's direction. Shots struck some store glass and a nearby car window. A bullet hit Hubbard in the thigh, causing him to cry out and fall to the ground. At least two eyewitnesses observed appellant fire this first shot into Hubbard's thigh, and then shoot Hubbard in the lower back and fire another shot into Hubbard's head at close range. Witnesses heard appellant proclaim "I'm letting him loose out here" and "[t]his how Knowledge bust (sic) shots." *Page 3 
 {¶ 4} At that time, Delreno Miller ran up to the store, yelling that Hubbard had been shot. Store personnel called for emergency assistance, while appellant fled toward the nearby Highland Park apartments. Hubbard later died of his wounds.
 {¶ 5} Canton Police detectives, via interviews and photo arrays, determined that appellant was a suspect and was staying at the vacated Highland Park apartment of Marave Lowe, a female friend who had recently relocated to New Philadelphia. The apartment was subsequently searched, and police officers found male clothing and a hospital bill in appellant's name. However, appellant by then had moved into a girlfriend's apartment on Harriett Avenue N.W., which detectives discovered via an anonymous tip. Appellant was arrested at that location. When brought in for questioning, appellant did not admit to the shooting, but he slumped down and began crying when informed the victim was just seventeen years old.
 {¶ 6} Although appellant's weapon was not recovered, Stark County Coroner Dr. P.S.S. Murthy's autopsy revealed the existence of subarachnoid and subgaleal hemorrhaging, and that the shot into Hubbard's head was fatal. Crime lab investigators concluded that bullets found at the scene came from a .38 or .357 caliber Colt revolver, and that the fatal shot was fired within three inches of Hubbard's head.
 {¶ 7} Appellant was indicted on January 23, 2006, on one count of murder with a firearm specification (F-1), one count of having a weapon under a disability (F-3), and one count of carrying a concealed weapon (F-4). After a two-day jury trial commencing on April 10, 2006, appellant was found guilty on all charges in the indictment. The trial court thereupon sentenced appellant to fifteen years to life on the murder count, with an additional three years on the firearm specification, and five years for having a weapon *Page 4 
under a disability, to run consecutively. The sentence for carrying a concealed weapon was merged with the sentence for having a weapon under a disability. Appellant was thus sentenced to a prison term of at least twenty-three years before eligibility for parole.
 {¶ 8} On May 15, 2006, appellant filed a notice of appeal. He herein raises the following four Assignments of Error:
 {¶ 9} "I. THE EVIDENCE AT TRIAL WAS INSUFFICIENT TO SUPPORT A CONVICTION, AND THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 10} "II. THE TRIAL COURT ERRED IN PERMITTING THE STATE TO OFFER INCRIMINATING HEARSAY TESTIMONY IN VIOLATION OF RULE 802 OF THE OHIO RULES OF EVIDENCE.
 {¶ 11} "III. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ENTERED A JUDGMENT OF CONVICTION AND SENTENCED APPELLANT ON ALLIED OFFENSES OF SIMILAR IMPORT IN VIOLATION OF R.C. 2941.25 AND ALSO IN VIOLATION OF THE STATE AND FEDERAL PROHIBITIONS AGAINST THE IMPOSITION OF MULTIPLE PUNISHMENTS AS SET FORTH IN THE DOUBLE JEOPARDY CLAUSE, IN ADDITION TO FAILING TO SATISFY THE STATUTORY REQUIREMENTS FOR IMPOSING CONSECUTIVE SENTENCES.
 {¶ 12} "IV. THE TRIAL COURT PLAINLY ERRED IN IMPOSING MAXIMUM PRISON TERMS FOR APPELLANT'S SEPARATE CONVICTIONS." *Page 5 
 I. {¶ 13} In his First Assignment of Error, appellant maintains his conviction for murder was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.
 Sufficiency {¶ 14} In considering an appeal concerning the sufficiency of the evidence, our standard is as follows: "* * * [T]he inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt ." State v.Jenks (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.
 {¶ 15} The statute under which appellant was indicted is R.C.2903.02(A), which reads: "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." In turn, R.C. 2901.22(A) reads: "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 16} We note appellant's argument consists entirely of the general assertions that the statute requires a showing of "purposely" and that the record lacks "sufficient factual proof" to support a conviction. We reiterate that an appellant's brief is to present "[a]n argument containing the contentions of the appellant with respect to [the] assignment of error presented for review and the reasons in support of the contentions, *Page 6 
with citations to the authorities, statutes, and parts of the record on which appellant relies," as per the requirements set forth in App.R. 16(A)(7).
 {¶ 17} Nonetheless, a review of the record reveals several witnesses placed appellant at the scene, "tussling" or having a confrontation with Kortez Hubbard before appellant began firing. Although appellant's revolver was never recovered, eyewitness Starla Pride clearly testified to the nature of the shooting:
 {¶ 18} "BY [ASSISTANT PROSECUTOR] MS. SCHNELLINGER:
 {¶ 19} "Q. And you see them tussling. Then what happens?
 {¶ 20} "A. Then the guy pulls out the gun.
 {¶ 21} "Q. And you see the guy pull out a gun?
 {¶ 22} "A. Uh-huh.
 {¶ 23} "Q. Do you see where he pulls it out from?
 {¶ 24} "A. Not actually where but he pulled it out.
 {¶ 25} "Q. So you see him holding a gun?
 {¶ 26} "A. Uh-huh.
 {¶ 27} "Q. Do you hear anybody say anything?
 {¶ 28} "A. They said, he got a gun. And I just took off running.
 {¶ 29} "Q. Where do you run to?
 {¶ 30} "A. Right on the other side of the car. That's the furthest that I could get. I didn't want to get shot so I ducked up under the car.
 {¶ 31} "Q. Which car are you talking about?
 {¶ 32} "A. That car, the Mercury.
 {¶ 33} "Q. The red one? *Page 7 
 {¶ 34} "A. Uh-huh.
 {¶ 35} "Q. So you were in front of that car?
 {¶ 36} "A. I was on the driver's side up under the car.
 {¶ 37} "Q. So you're actually underneath the car?
 {¶ 38} "A. Yes.
 {¶ 39} "Q. What do you hear when you're underneath the car?
 {¶ 40} "A. I hear one shot and then I heard Hub scream or whatever, and then the guy walked back up on him and shot him again.
 {¶ 41} "Q. Do you see this underneath the car?
 {¶ 42} "A. Uh-huh.
 {¶ 43} "Q. And what do you mean he walked up on him?
 {¶ 44} "A. He walked up on him and pulled the gun and shot it.
 {¶ 45} "Q. And is he next to him?
 {¶ 46} "A. Directly over him.
 {¶ 47} "Q. How many times did he shoot him?
 {¶ 48} "A. I think there was once, twice. He shot him twice.
 {¶ 49} "Q. Do you see where he's shooting him?
 {¶ 50} "A. I didn't see exactly where but afterwards I knew that in the head.
 {¶ 51} "A. So underneath the car you can see him walk up. Do you see like his feet?
 {¶ 52} "A. I see his feet.
 {¶ 53} "Q. And he's standing over him?
 {¶ 54} "A. Uh-huh. *Page 8 
 {¶ 55} "Q. So is he standing like his feet are next to him or is he on top of him or is he straddling?
 {¶ 56} "A. He's like next to him, just pointed the gun.
 {¶ 57} "Q. You see the gun pointed at Kortez?
 {¶ 58} "A. Yeah. I see the bottom of his feet and his arms. That's all I could see under the car.
 {¶ 59} "Q. Do you hear anybody saying anything?
 {¶ 60} "A. I heard the guy said, I'm letting him loose out here. They ain't ready for that. Then he —
 {¶ 61} "Q. He says this before or after?
 {¶ 62} "A. Afterwards.
 {¶ 63} "Q. You heard him say that again?
 {¶ 64} "A. He letting him loose out here. They ain't ready for that.
 {¶ 65} "Q. What do you see after you see the guy shoot Kortez?
 {¶ 66} "A. Then I get up and go see, and Hub is laying there, and I see him running down Alan Page.
 {¶ 67} "Q. Did you get a good look at the guy that shot Kortez?
 {¶ 68} "A. Yes.
 {¶ 69} "Q. Was this while you were fighting did you see him?
 {¶ 70} "A. While he was fighting?
 {¶ 71} "Q. Do you see the man that shot — so you think — what about the guy that had the gun? Is that the same guy that Kortez was fighting with?
 {¶ 72} "A. Yeah. *Page 9 
 {¶ 73} "Q. And you got a good look at him at that point too?
 {¶ 74} "A. Yes.
 {¶ 75} "Q. Do you see the guy that was holding the gun in the courtroom?
 {¶ 76} "A. Yeah.
 {¶ 77} "Q. Can you point him out for the Court?
 {¶ 78} "A. Him, (Indicating)." Tr. at 317-320.
 {¶ 79} Appellant was thus seen standing over the wounded victim when he fired the third shot at extremely close range. Under these circumstances, we find reasonable jurors could have found the "purposely" element of R.C. 2903.02(A) beyond a reasonable doubt.
 Manifest Weight {¶ 80} Our standard of review on a manifest weight challenge to a criminal conviction is stated as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also, State v. Thompkins (1997),78 Ohio St.3d 380, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175, 485 N.E.2d 717.
 {¶ 81} In the case sub judice, the State presented fourteen witnesses, including eight who were at the scene of the shooting. Some of these witnesses only saw or heard portions of the events, in some cases because they were seeking cover from *Page 10 
appellant's gunfire. For example, customer Staci Smith was sitting in a car playing some CDs when a stray bullet crashed into the passenger window. Jumping out of the car, she saw appellant pointing a gun and Hubbard lying on the ground near one of the car's tires. Hitting the deck, she then heard two more shots. Tr. at 301-303. Likewise, Vincent Relford was backing his vehicle out on a nearby street and did not clearly see the face of the shooter, but told police he saw a man in a dark jacket and jeans running from the scene. Tr. at 229. Store employees Edie Seymour and Bernita Singletary only heard the shots but placed appellant at the scene moments beforehand. Tr. at 244, 339-342.
 {¶ 82} The overall record, including the testimony of Miller, Pride, and Juwan Burton, reveals consistent recounts of appellant being at the store in a camouflage-style jacket and jeans, then getting into an altercation with Hubbard, followed by appellant's gunshots striking the victim. Upon review, we find the evidence reviewed in its entirety does not lead to a conclusion that the jury lost its way and created a manifest miscarriage of justice.
 {¶ 83} Accordingly, appellant's First Assignment of Error is overruled.
 II. {¶ 84} In his Second Assignment of Error, appellant contends the trial court erred in admitting hearsay statements during the testimony of witness Juwan Burton. We disagree.
 {¶ 85} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). The admission or exclusion of evidence rests in the sound discretion of the trial court.State v. Sage (1987), 31 Ohio St.3d 173, 180. As a general *Page 11 
rule, all relevant evidence is admissible. Evid.R. 402; cf. Evid.R. 802. Our task is to look at the totality of the circumstances in the case sub judice, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably. State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027.
 {¶ 86} At trial, Juwan was permitted to testify that his cousin, Lorenzo Burton, had asked appellant whether there was "still a problem" regarding the earlier dispute over a dog, to which appellant replied "no." Tr. at 269. Juwan also testified that he heard the cashier, Bernita Singletary, tell Lorenzo to let appellant "go on about his business." Id. Upon review, in light of the weight of the remaining evidence, we find these comments merely provided a background for the scene of the shooting and were at worst harmless error, as they scarcely create any inferences pertaining to appellant and the victim, Hubbard. We also note that Singletary herself later testified to making virtually the same comment inside the store. See Tr. at 341.
 {¶ 87} The court's allowance of Juwan's testimony thus did not constitute an abuse of discretion. Appellant's Second Assignment of Error is overruled.
 III. {¶ 88} In his Third Assignment of Error, appellant maintains the trial court erred and violated his constitutional rights by sentencing him on allied offenses of similar import and by imposing consecutive sentences. We disagree.
 Allied Offenses of Similar Import {¶ 89} Appellant challenges the propriety of his convictions and sentences for both murder and having a weapon under a disability.
 {¶ 90} R.C. 2941.25(A) addresses multiple counts and provides as follows: *Page 12 
 {¶ 91} "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."
 {¶ 92} In State v. Rance, 85 Ohio St.3d 632, 710 N.E.2d 699,1999-Ohio-291, the Ohio Supreme Court stated the test for determining whether crimes are allied offenses of similar import: "If the elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import.'" [Citations omitted.] Id. at 636,710 N.E.2d 699. The Supreme Court further held that in making this determination, a court must align the elements of each crime in the abstract. Id. at 638, 710 N.E.2d 699. If the elements do so correspond, the defendant may not be convicted of both crimes unless the court finds that the defendant committed the crimes separately or with separate animus. Id. at 638-639, 710 N.E.2d 699.
 {¶ 93} Upon review, we hold that the offense of having a weapon under a disability does not necessarily result in the offense of murder, and vice-versa. Although appellant relies on State v. Mickens (Feb. 13, 1992) Franklin App. No. 91-AP-766 in support of his argument, we note said case predates the Rance decision and is thus unpersuasive in our present review.
 Consecutive Sentences {¶ 94} In State v. Firouzmandi, Licking App. No. 2006-CA-41,2006-Ohio-5823, ¶ 40, we concluded that post-Foster, an appellate court reviews the imposition of consecutive sentences under an abuse of discretion standard. Id. An abuse of *Page 13 
discretion implies the court's attitude is "unreasonable, arbitrary or unconscionable." See State v. Adams (1980) 62 Ohio St.2d, 151, 157.
 {¶ 95} The crux of appellant's argument is that the imposition of a five-year sentence, consecutive to his eighteen-year to life sentence on the most serious offense (inclusive of the firearm specification), will "significantly increase" his incarceration before parole, and is inconsistent with the overriding purposes of felony sentencing per R.C.2929.11 and 2929.13. However, upon review, we are unpersuaded the trial court abused its discretion in rendering its consecutive sentence against appellant.
 {¶ 96} Appellant's Third Assignment of Error is overruled.
 IV. {¶ 97} In his Fourth Assignment of Error, appellant maintains the trial court erred in imposing maximum sentences for murder and having a weapon under disability. We disagree.
 {¶ 98} Judicial fact-finding is no longer required before a court imposes maximum prison terms. State v. Mooney, Stark App. No. 2005-CA-00304, 2006-Ohio-6014, ¶ 58, citing State v. Foster,109 Ohio St.3d 1, 845 N.E.2d 470, 2006-Ohio-856; State v. Mathis,109 Ohio St.3d 54, 846 N.E.2d 1, 2006-Ohio-855. In the case sub judice, appellant went to the environs of a busy convenience store with a concealed loaded revolver, despite a prior felony record for robbery forbidding him from even possessing a weapon, and shot Hubbard after a brief altercation three times, the third and fatal shot made after the wounded victim had already fallen to the asphalt. Upon review of the *Page 14 
record, we are unpersuaded the trial court abused its discretion in ordering maximum sentences on the two counts at issue.[1]
 {¶ 99} Appellant's Fourth Assignment of Error is overruled.
 {¶ 100} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.
Wise, J. Gwin, P. J., concurs. Hoffman, J., concurs separately.
[1] We additionally note that an indefinite term of fifteen years to life for a murder conviction under R.C. 2903.02 is mandated by R.C.2929.02(B). *Page 15